**\*\*NOT FOR PUBLICATION\*\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

JANICE MARRIN,

                         Plaintiff,

     v.

CAPITAL HEALTH SYSTEMS, INC.,
JOAN DUVALL, and CAROLANN BASS,

                         Defendants.

_____

Civil Action No. 14-2558 (FLW)(LHG)

**<u>OPINION</u>**

**<u>WOLFSON, United States District Judge</u>**:

Before the Court are the cross motions of Plaintiff Janice Marrin ("Plaintiff" or "Marrin") and Defendants Capital Health Systems, Inc., Joan DuVall, and Carolann Bass ("Defendants") for summary judgment on the claims raised in Plaintiff's Second Amended Complaint under the New Jersey Conscientious Employee Protection Act, N.J. Stat. Ann. §§ 34:19-1 *et. seq.* ("CEPA"), New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-12 ("NJLAD"), and the Family Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et. seq.* ("FMLA"). Plaintiff contends that Defendants discriminated against, interfered with, and retaliated against Plaintiff on the basis of her taking FMLA protected leave by terminating her after the completion of an allegedly fraudulent progressive discipline program. Defendants contend that Plaintiff has failed to state a prima facie case for discrimination or retaliation, and, in any event, was terminated for a legitimate business purpose after she failed to cooperate with Defendants' internal investigation into missing confidential documents, some of which were found in Plaintiff's possession. For the reasons that follow, this Court grants summary judgment in favor of Defendants on all Counts of the Second Amendment Complaint and denies Plaintiff's cross motion.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

Plaintiff began working for Defendant Capital Health Systems, Inc. ("Defendant" or "Capital Health") in Trenton, New Jersey, in November 2005. Tr. of Aug. 20 and Aug. 27, 2015 Dep. of Janice Marrin ("Marrin Dep."), at 35:8-18; Defendants' Statement of Material Facts ("DSMF") ¶ 1. Capital Health hired Plaintiff as a medical laboratory technician ("lab tech") to work in the microbiology lab at what was then known as the Helene Fuld campus of Capital Health Medical Center, under microbiology lab supervisor Betty Zaslavsky. Marrin Dep. 36:1-2, 60:11-13, 59:9-22; DSMF ¶ 2. Zaslavsky's supervisor was Len Levin, the laboratory director. Marrin Dep. 36:5-7, 59:14-24; DSMF ¶ 3. Levin managed both of Capital Health's laboratories, only one section of which was the microbiology lab. Decl. of Nancy Analore ("Analore Decl."), at ¶ 4; DSMF ¶ 4. Capital Health also employed a laboratory manager, Nancy Analore, to assist Levin in overseeing the hospital's labs. Analore Decl. ¶ 2; DSMF ¶ 5. Levin had previously worked with Plaintiff at another hospital, St. Francis Medical Center, and the two enjoyed a good relationship. Marrin Dep. 36:1-10; DSMF ¶ 6. Levin hired Plaintiff despite the fact that she was not a certified laboratory technician, and "grandfathered" her into the position. Marrin Dep. 30:14-15; DSMF ¶ 7.

In 2010, the microbiology lab moved to a new location in Mercer County. Marrin Dep. 60:15-17; Analore Decl. ¶ 3; DSMF ¶ 8. In early 2010, Zaslavsky went out on medical leave and eventually retired. Analore Decl. ¶ 5; *see also* Marrin Dep. 64:13-17; DSMF ¶ 9. Capital Health then hired Carolann Bass to assume Zaslavsky's position as the microbiology lab supervisor. Decl. of Carolann Bass ("Bass Decl.") at ¶ 2; *see also* Marrin Dep. 64:13-24; DSMF ¶ 10. Bass reported for a time to Levin as the lab director, until Capital Health terminated his employment in mid-2012. Analore Decl. ¶ 6; Bass Decl. ¶ 3; DSMF ¶ 11. The position of Lab Director at Capital Health remained unfilled for approximately five months. Analore Decl. ¶ 6; DSMF ¶ 12.

In November 2012, Capital Health named Joan DuVall as the new lab director for the hospital system, and Bass began reporting to DuVall. Bass Decl. ¶5; Decl. of Joan DuVall ("DuVall Decl.") at ¶ 2; *see also* Marrin Dep. 65:17-66:4; DSMF ¶ 13. Ms. DuVall was officially hired and started work for Capital Health on December 10, 2012. DuVall Dep. Tr. 5:7. This date is critical for the present motions because, although Plaintiff had regularly taken FMLA leave prior to this date and had been subject to disciplinary actions by Capital Health for, *inter alia*, unsatisfactory work performance, tardiness, and absenteeism, Plaintiff contends that the alleged illegal discrimination, which is the subject of the present motions, began only after DuVall's hiring. Plaintiff's Opposition and Cross Motion, 1 ("The only disciplinary actions and incidents that are relevant are those that occurred after Defendant Joan DuVall was hired in November 2012."). Plaintiff then took an approved FMLA leave from December 13, 2012 through December 23, 2012. Plaintiff's Ex. 14.

In early January 2013, DuVall asked Plaintiff to wear a lab coat instead of the plastic apron that Plaintiff preferred. *See* Marrin Dep. 227:5-228:13; DSMF ¶ 28. Plaintiff was upset by this incident because she believed that DuVall unnecessarily "yelled" at her after Plaintiff had questioned her immediate supervisor, Bass, whether the plastic apron was no longer appropriate laboratory protective wear, as Plaintiff believed it had been under DuVall and Bass's predecessors. Plaintiff's Counterstatement of Material Facts ("PCSMF") ¶ 28). Subsequently, Plaintiff went on unscheduled PTO on January 7, 8, and 9. Plaintiff's Ex. 14.

On January 16, 2013, Plaintiff and another lab tech engaged in a verbal "dispute" within the microbiology lab. Marrin Dep. 100:5-101:23; DSMF ¶ 30. Plaintiff objects to the characterization of this incident as a dispute, contending that she was only speaking to her coworker to try to resolve "an issue" she perceived the coworker had with Plaintiff, which was leading the coworker to report Plaintiff to DuVall and Bass. Marrin Dep Tr. 101:10-20. It is

undisputed, however, that the coworker was upset by this interaction and sought to involve supervisors. Immediately after the incident occurred, Defendants contend that DuVall asked to speak to Plaintiff about the incident while Plaintiff was at her laboratory station. Plaintiff did not speak with DuVall and instead left the building. *See id.*; DuVall Decl. ¶ 5; DSMF ¶ 31. Plaintiff contends that she left the building for 15 minutes for her morning break and that DuVall never tried to speak with Plaintiff about this incident before Plaintiff received a written disciplinary notification. PCSMF ¶ 31.

Ms. DuVall then directed Ms. Bass to issue a written warning for "inappropriate behavior toward a coworker and job abandonment." Marrin Dep. 132:22-133:17; Disciplinary Action Notice dated 1/16/13, Defendants' Ex. 5; Bass Decl. ¶ 8, Ex. 3; DuVall Decl. ¶ 6; DSMF ¶ 32. This was Plaintiff's fifth written warning in the seven years she had worked for Capital Health. *See* Ex. 5. Plaintiff refused to sign it. *See id.* at Disciplinary Action Notice dated 1/16/13; DSMF ¶ 33. Analore asked DuVall to note Plaintiff's attitude on her performance evaluation. *See* Jan. 2013 Email, Defendants' Ex. 9; DSMF ¶ 34.

Meanwhile, DuVall had observed that the techs in every lab, including Plaintiff, were failing to follow the written attendance and break policies. *See* Memo dated Jan. 30, 2013, Defendants' Ex. 10; DuVall Decl. ¶ 7; DSMF ¶ 35. In mid-January, Ms. DuVall verbally warned Plaintiff regarding the break policy. Break Periods Policy with J. Marrin Notes, Defendants' Ex. 11; DSMF ¶ 36. DuVall did not explicitly advise any employees of any change in the break policy. PCSMF ¶ 36. Indeed, it is undisputed that Capital Health's official, written break policy was not changed in the period immediately before and after Ms. DuVall's hiring.

Ms. DuVall also issued a memo to all lab staff in late January 2013, Memo dated Jan. 30, 2013, Defendants' Ex. 10, which discussed the Hemolysis policy, the Charge Tech Policy, the Attendance Policy, and the Smoking, Meal, and Breaks Policy. The memorandum emphasizes the

need to comply with those particular policies. Plaintiff categorizes the memorandum as reflecting changes in policy.

On February 4 and 6, 2013, Marrin called out of work by leaving a message regarding her absence on Bass' office voicemail. She did not speak with the tech-in-charge of the lab that she would be out for a period of time, nor did she speak directly with her supervisor, Ms. Bass. *See* Disciplinary Action Notice dated 2/12/2013, Defendants' Ex. 5; Bass Decl. ¶ 9; DSMF ¶ 38. Calling out by leaving a voicemail violated the call out policy in place in February 2013. *See* Policies dated Decl. 2006, Jan. 2009, Aug. 2011, and Feb. 2013, Defendants' Ex. 12; DSMF ¶ 42. The same policy had been in place during the entire length of Plaintiff's tenure at Capital Health. *Ibid.* Plaintiff does not, and cannot, dispute that she violated the written policy by leaving a voicemail, but contends that her calling out did not violate the labs' actual, unwritten policy which had developed as a matter of custom during the seven years in which Plaintiff had worked for Capital Health. Specifically, Plaintiff contends that, to that point, she had called out by leaving voice messages periodically during the seven year length of her tenure, whenever there was not a tech-in-charge or supervisor available to directly take her call. The parties agree that it is important that lab techs properly communicate their absence and how long they expect to be out so that appropriate shift coverage can be arranged. Marrin Dep. 145:17-22; DSMF ¶ 39.

On February 12, 2013, Ms. Bass issued a final written warning for the call out policy violation. *See* Disciplinary Action Notice dated 2/12/2013, Defendants' Ex. 5; Bass Decl. ¶ 10; DSMF ¶ 40. Plaintiff protested the disciplinary action, claiming that she had called out the same way she always had while working for her previous supervisors, and claiming that she did not know the policy had "changed." Marrin Dep. 136:3-17; DSMF ¶ 41. Plaintiff refused to sign the disciplinary action notice. *See* Disciplinary Action Notice dated 2/12/2013, Defendants' Ex. 5; DSMF ¶ 43.

After her February 4, 2013 to February 8, 2013 leave (the leave for which she had been disciplined on February 12 for not complying with the call out policy), Plaintiff called out again from February 11 through February 15, 2013. Plaintiff's Ex. 14.[1] Bass was unsure of how to code Plaintiff's absences, whether as FMLA, personal leave or as something else, because Plaintiff had requested that the first two weeks of February not be counted against her FMLA leave, and so Bass reached out via e-mail to DuVall and Analore. *See* Feb. 2013 Emails, Defendants' Ex. 13; Bass Decl. ¶11; DSMF ¶ 45.

Analore reminded Bass that it was the duty of all supervisors to track the time of their employees. *See* Feb. 2013 Emails, Defendants' Ex. 13; DSMF ¶ 48. There were a number of lab employees who used both FMLA leave and other types of leave, and Analore's concern was that without proper coding, an employee ran the risk of not getting paid. Analore Decl. ¶13; DSMF ¶ 47.

In mid-February, Plaintiff made an appointment with Human Resources. *See* Feb. 15, 2013 Email, Exhibit 19; *see also* Decl. of Richard Werner ("Werner Decl.") at ¶ 2; DSMF ¶ 63. Werner, who had responsibility for the Hopewell campus, met with Plaintiff. *See* Feb. 15, 2013 Email, Defendants' Ex. 19; Werner Decl. ¶ 2; DSMF ¶ 64. At the meeting, Plaintiff complained to Werner regarding alleged deficiencies in the microbiology lab, the attitudes of her co-workers and her last two disciplinary actions, for engaging in inappropriate behavior with a coworker and violating policy, which she claimed were unwarranted. Marrin Dep. 162:10-24, 175:21-177:3, 185:19-187:18; Werner Decl. ¶ 3; Werner Notes, Defendants' Ex. 21; DSMF ¶ 65.

After interviewing Plaintiff and obtaining the names of the lab techs with knowledge of some of her complaints, Werner interviewed each of them. *See* Werner Tech Interview Notes,

---

[1] The parties seem to agree that Plaintiff was present for some portion of February 12, 2013, when she received her written discipline.

Defendants' Ex. 22; Werner Decl. ¶ 6; DSMF ¶ 66. Werner found the lab tech's testimony credible, and determined that Plaintiff's complaints were unfounded. Werner Decl. ¶ 6; DSMF ¶ 67. Since Werner had no background in lab work or science, he referred Plaintiff's complaints about the alleged deficiencies in the microbiology lab to Bass to investigate. Werner Decl. ¶ 4; DSMF ¶ 68. He also asked Plaintiff to provide him with a written document detailing her complaints, as well as any documents that supported her claims. Werner Decl. ¶ 7; DSMF ¶ 69. Plaintiff did not provide Werner with a written document detailing her complaints until shortly before her employment was terminated. Werner Decl. ¶ 8; DSMF ¶ 70. Werner had made the same request of DuVall, who provided him with the disciplinary actions, evidence of Plaintiff's absence and tardiness, and written co-worker complaints. Werner Decl. at ¶ 5; DuVall Decl. ¶ 14; DSMF ¶ 71. After reviewing the evidence that both parties provided, Werner determined that Plaintiff's complaints were unfounded. Werner Decl. at ¶ 9; DSMF ¶ 72.

After Plaintiff's first meeting with Werner, but while the investigation into Plaintiff's complaints was still ongoing, on February 20 and 21, 2013, Bass submitted written complaints to DuVall regarding Plaintiff's recent "harassing" and "threatening" behavior. *See* Bass Complaints, Defendants' Ex. 14; Bass Decl. ¶12; DuVall Decl. ¶11. Bass complained that Plaintiff came into her office and confronted her in an aggressive manner. *See id.*; DSMF ¶ 49. Plaintiff contends that this incident arose because Plaintiff was advised by Werner to speak directly to her supervisor, Bass, to advise her of what Plaintiff believed was going wrong and how it was affecting the laboratory. Plaintiff contends that she simply told Bass what Bass was doing wrong. PCSMF ¶ 49. Nevertheless it is undisputed that Bass found Plaintiff's comments and manner aggressive and inappropriate.

DuVall then launched an investigation, including speaking to the other lab techs who witnessed the event. Three of the lab techs stated that they heard Plaintiff shouting at Bass. *See*

Investigation Notes, Defendants' Ex. 15; DuVall Decl. ¶¶ 11-12; DSMF ¶ 50.[2] Other lab techs told DuVall that Plaintiff took several breaks on a day when she announced she was going to Human Resources, that she often left the lab without explanation and that she complained about her supervisors and her shift. *See* Investigation Notes, Defendants' Ex. 15; DuVall Decl. ¶ 12; DSMF ¶ 51.[3] DuVall issued Plaintiff a written warning for another policy violation, this time for "unacceptable behavior towards superior." *See* Disciplinary Action Notice dated 3/25/13, Defendants' Ex. 5; DuVall Decl. ¶12; DSMF ¶ 52. Plaintiff contests that her behavior was inappropriate or unacceptable. The warning came with a one-day suspension and noted that Plaintiff told Bass that "she needed a backbone," and that Bass was letting the "lab director [DuVall] dictate what to do." *See* Disciplinary Action Notice dated 3/25/13, Defendants' Ex. 5; DSMF ¶ 53.

One of the lab techs who witnessed Plaintiff's Feb. 21, 2013 exchange with Bass, Claire Burns, went to Analore to complain. *See* Feb. 21, 2013 Email, Defendants' Ex. 16; Analore Decl. ¶14; DSMF ¶ 56. [4] Burns stated that Plaintiff caused "tension" in the lab and noted a specific incident in which Plaintiff tried to make the other lab techs "look bad" in an effort to excuse her own behavior. *See* Feb. 21, 2013 Email, Defendants' Ex. 16; Analore Decl. ¶14. Burns complained that Plaintiff would "frequently" go into Bass' office, close the door and then shout so loudly that

---

[2] Plaintiff disputes this and other material facts on the grounds that the statements of other lab techs are inadmissible hearsay. "[T]he rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are *capable of being admissible at trial*. In ruling on a motion for summary judgment, the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial. The proponent need only 'explain the admissible form that is anticipated.'" *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238–39 (3d Cir. 2016) (quotations omitted) (emphasis in original). Here Defendants have identified the key witness tech, Claire Burns, and provided her deposition. Defendant's Exhibit 30. No question has been raised as to unavailability for trial.

[3] See note 2, *supra*.

[4] See note 2, *supra*.

the lab techs could hear her through the door. *See id.*; DSMF ¶ 57.[5] Analore reported the lab tech's

concerns to Werner in HR. *See* Feb. 21, 2013 Email, Ex. 16; Analore Decl. ¶15; DSMF ¶ 58.[6]

Shortly after the February 21 incident with Bass, Plaintiff had requested and was approved

for FMLA leave, and she did not return to work for more than a month. Bass Decl. ¶13; DuVall

Decl. ¶13; DSMF ¶ 54. Although the record is somewhat unclear on this point, due to the fact that

Plaintiff was scheduled to work on some weekends such that it is uncertain whether a weekend

day was not taken as FMLA leave because it was worked or because no work was required, it is

undisputed that Plaintiff worked the weekend of February 23-24, went out on leave on or around

February 26, 2013, and returned to work on or by March 25 or 26, 2013. Plaintiff's Ex. 14.

At a follow-up, in-person meeting with Plaintiff on March 18, 2013 — during the period

while Plaintiff was on FMLA leave — where Werner planned to discuss the results of his

investigation into Plaintiff's February complaint, Plaintiff gave him three emails between Analore,

Bass and DuVall from January and February 2013, regarding guidance requested by Bass from

HR and Analore on how to code Plaintiff's FMLA and non-FMLA absences and her disciplinary

---

[5] See note 2, *supra*.

[6] Marrin also filed a complaint with the Department of Labor in late February 2013, in which she alleged Capital Health was interfering with and retaliating against her because of her FMLA leave. *See* Werner Dec. ¶ 10; DOL File, Defendants' Ex. 23; DSMF ¶ 73. Werner complied with the DOL investigator's request for details regarding Marrin's absences and how they were coded, either as FMLA leave, personal leave, or some other type of leave. Werner Dec. ¶ 11; DSMF ¶ 74. The DOL investigator reviewed a number of documents provided to him by Marrin, as well as FMLA documentation sent by Capital Health in response to the investigation. *See* DOL File, Defendants' Ex. 23; Werner Dec. ¶ 12; DSMF ¶ 75. Upon completion of its investigation, the DOL determined that Capital Health had not violated the FMLA. *See* Defendants' Ex. 23 at DEFS-DOL-000001-2, DOL Complaint Resolution; DSMF ¶ 76. In her Opposition and Cross Motion Plaintiff asks the Court not to take judicial notice of the findings of the Department of Labor's investigation on the grounds that they were reached without the benefit of a full adversary process. For the purpose of the present cross motions for summary judgment, however, the Court need not, and does not consider the reliability of the Department's findings, only noting that the investigation occurred and Mr. Werner, the decision maker responsible for Plaintiff's termination was aware of the investigation.

issues. *See* Confidential Emails, Defendants' Ex. 24; Marrin Dep. 187:3-18, 287:2-288:10; Tr. of Nov. 17, 2015 Dep. of Richard Werner ("Werner Dep.") at 6:1-7:12; Werner Decl. ¶13; DSMF ¶ 77.

Plaintiff claimed to Werner that the emails demonstrated that Analore, DuVall and Bass were issuing trumped-up discipline as a means to have her fired. Marrin Dep. 288:11-289:12; DSMF ¶ 78. When Werner realized that Plaintiff was not copied on any of the emails, he asked her how she obtained them. Confidential Email File, Defendants' Ex. 24; Werner Decl. ¶14; DSMF ¶ 79. Plaintiff would not identify the person who allegedly gave them to her and stated that they were given to her anonymously. Marrin Dep. 288:7-10l; Werner Dep. 6:1-7:22; Werner Decl. ¶14; DSMF ¶ 80. Werner then informed DuVall and Bass that Plaintiff had somehow obtained their confidential emails, and asked how that could have occurred. Werner Dep. 9:16-19; Werner Decl. ¶ 15; DSMF ¶ 81. Bass had reported to Werner that she suspected Plaintiff herself had gone into Bass' office when she wasn't there, opened her filing cabinet drawer and then removed confidential documents and emails from a manila folder that was labeled "Carolann." Bass Decl. at ¶ 15; DSMF ¶ 82. Bass said she noticed the confidential documents and emails missing when she found her jury form, which had been in the Carolann folder, lying near the rack where Plaintiff stored snacks and personal items in a small storage room just off the microbiology lab. Bass Decl. ¶ 17; DSMF ¶ 83. Upon finding her jury form, Bass walked back to her office to put it in the "Carolann" folder, and discovered the documents missing from her filing cabinet. Bass Decl. ¶ 18; DSMF ¶ 84. Bass had kept several items in the folder relating to her personal matters, as well as emails and memos regarding the microbiology lab techs. Bass Decl. ¶ 18; DSMF ¶ 85. Many of the documents in the folder were missing, including some relating to other lab techs. Bass Decl. ¶ 19; DSMF ¶ 86. Bass knew that Plaintiff had seen her put personal documents in the confidential "Carolann" folder, because Plaintiff was in Bass' office talking to her while watching Bass place

documents in the folder and then put the folder back in the filing cabinet, on Friday, February 22, 2013, the day before Plaintiff was scheduled to work the weekend. Bass Decl. ¶ 20; DSMF ¶ 87. Plaintiff denies that she saw Bass place documents in the folder. PCSMF ¶ 87.

Another internal investigation, this time related to Plaintiff being in possession of the confidential e-mails, was launched, and Bass, after consultation with Werner, interviewed the lab techs who worked the weekend of February 23-24, 2013, when it was suspected the confidential documents disappeared. Bass Decl. ¶ 21; Werner Decl. ¶ 16; DSMF ¶ 88. One tech reported that she saw Marrin go into Bass' office during the weekend shift, but she did not remember seeing Marrin with papers. *See* Bass Emails re: Confidential Investigation, Defendants' Ex. 26; DSMF ¶ 89. This investigation progressed largely during the period in March where Plaintiff was out of the office on approved FMLA leave.

Plaintiff returned from her FMLA leave on March 25 or 26, 2013. Plaintiff's disciplinary meeting regarding the February 20-21 incidents with Bass took place on March 26, 2013. Plaintiff refused to sign the disciplinary notice after she was informed that she would be suspended effective March 27, 2013, with a return to work date of March 28, 2013. Bass Decl. ¶13; *see also* Marrin Dep. 171:2-11; DSMF ¶ 55.

Capital Health employees received their performance reviews in March 2013, and Plaintiff received hers shortly after returning from FMLA leave. Marrin Dep. 221:12-20; *see also* 2012 Performance Review, Defendants' Ex. 17; DSMF ¶ 59; PCSMF ¶ 59. Although Plaintiff received several positive comments from Bass and was rated an "Improving Contributor" in several areas by DuVall, Plaintiff's overall rating was poor. *See* 2012 Performance Review, Defendants' Ex. 17; DSMF ¶ 60. Plaintiff was upset upon getting her performance review to learn that DuVall had participated in her 2012 review; Plaintiff felt that DuVall should not comment on the period of

Plaintiff's employment before DuVall was hired by Capital Health in November or December 2012. PCSMF ¶ 60; Marrin Dep. 209:2-24; DSMF ¶ 61.

Because Plaintiff was on leave from late February through late March, she was not interviewed as part of Werner's internal investigation into the missing confidential documents until March 28, 2013. DuVall Decl. ¶16; DSMF ¶ 90. During that interview, Plaintiff admitted she would often enter and sit in Bass' office to drink her coffee. She also said she could not remember seeing anyone else go into Bass' office on the weekend of February 23-24. *See* DuVall Notes re Confidential Investigation, Defendants' Ex. 27; DSMF ¶ 91. Plaintiff continued to maintain either that she did not know who gave her the emails, or that she received them "anonymously from a friend." Marrin Dep. 288:7-10; DSMF ¶ 92.

On or around April 3, 2013,[7] Plaintiff was called in by DuVall for a follow up interview. By this point in time, the remainder of the internal investigation, including documenting Bass' account and interviewing the other lab techs who had worked the weekend of February 23-24 was complete, and Defendants sought to question Plaintiff again concerning how she obtained the documents and what if any other confidential emails or documents she had obtained. DuVall Dep. Tr. 49:1-8. Plaintiff claimed that she had already answered Defendants' questions and refused to answer any further questions. Marrin Dep. Tr. 297:10-16 (Q: "In a follow-up meeting – I'm on the second paragraph under details of incident – Janice was asked how these documents were presented to her and she refused to answer. Why didn't you answer?" A: "I already was quested about these and I told them I knew everything – I told them everything I knew about them.").

---

[7] The exact date of the follow-up interview is not found in the testimonial record. Plaintiff's termination notice states that the date of the incident in which Plaintiff refused to cooperate with the internal investigation was April 3, 2013, and no other evidence in the record conflicts with this account. The deposition testimony of Plaintiff, Werner, and DuVall, supports that the meeting occurred sometime between the March 28, 2013 meeting and Plaintiff's April 4, 2013 termination.

On April 3 or 4, 2013, after Werner had compiled all of the evidence from the internal interviews, reviewed the statements and consulted with outside counsel regarding the facts, he made the determination that Plaintiff's employment should be terminated for failure to cooperate in an internal investigation, as Capital Health believed that Plaintiff herself had broken into Bass' filing cabinet while alone in Bass' office and removed the emails and other confidential documents concerning other lab techs from Bass' cabinet, and then refused to answer Defendants' questions about the incident when asked about it during the follow-up interview. Werner Decl. ¶17; DSMF ¶ 94.

Werner then informed Marrin's supervisors that, given the circumstances regarding the missing confidential documents, Capital Health had decided to move forward with the termination. Werner Decl. ¶ 19; Bass Decl. ¶ 24; DuVall Decl. ¶ 17; DSMF ¶ 95. On April 4, 2013, DuVall and Bass met with Marrin to provide her with a disciplinary action for "failure to cooperate during an ongoing investigation," and to inform her that Capital Health was terminating her employment. *See* Disciplinary and Termination Notice dated April 4, 2013, Defendants' Ex. 5; DSMF ¶ 96.

This case was initially filed in the Superior Court of New Jersey, Law Division, Civil Part, Mercer County, and was removed to this Court on April 22, 2014. Plaintiff filed the twelve-count First Amended Complaint in this action on May 18, 2014. Defendants moved to dismiss nine of the counts in the First Amended Complaint on June 2, 2014. In an Opinion and Order dated January 29, 2015, the Court granted Defendants' motion as to eight counts and granted Plaintiff leave to amend as to one count. Plaintiff filed a Second Amended Complaint conforming the pleadings to the Court's Opinion on February 6, 2015. On October 10, 2016, Defendants moved for summary judgment on all counts of the Second Amended Complaint. Plaintiff opposed and cross moved for summary judgment on November 7, 2016. The parties' cross motions are now before the Court.

## II. ANALYSIS

After this Court's Opinion and Order partially granting Defendants' motion to dismiss the Second Amended Complaint, four counts remain in this case. In Count I, Plaintiff brings a claim under the Conscientious Employee Protection Act ("CEPA").[8] In Count II, Plaintiff brings a claim under the Family Medical Leave Act ("FMLA") under both interference and retaliation theories. Specifically, Plaintiff alleges:

> By terminating the Plaintiff from her employment after having been approved for intermittent leave to care for a serious health condition, Defendants violated the provision of the Family Medical Leave Act by interfering with Plaintiff's leave and retaliating against the Plaintiff for seeking her leave.
> Defendants deliberately created intolerable working conditions, interfered with the Plaintiff's leave and terminated the Plaintiff under the guise of their progressive discipline program.
> Defendants retaliated against the Plaintiff for seeking benefits in accordance with the Family Medical Leave Act.

Complaint, Count II, ¶¶ 4-7.

In Count V, Plaintiff brings a claim under the New Jersey Law Against Discrimination (NJLAD) under a retaliation theory. Specifically, Plaintiff alleges:

> Plaintiff's disability was a determinative factor in the Defendants [sic] decision to intentionally provide the Plaintiff with unwarranted progressive discipline to justify her termination.[9]

---

[8] The Second Amended Complaint erroneously purports to bring an action under the "Consciousness Employee Protection Act," but the Court construes Plaintiff's allegations as stating a CEPA claim.

[9] Here, Plaintiff's Complaint is poorly drafted. The title of Count V, "LAW AGAINST DISCRIMINATION – RETALIATION," makes clear that Plaintiff intends to pursue a retaliation theory under the NJLAD, but the supporting allegations in the paragraphs that follow appear to state only a non-retaliation disability discrimination claim. As explained, *infra*, Plaintiff's Opposition and Cross Motion make clear that Plaintiff is proceeding under a retaliation theory only, despite the general disability discrimination language in Count V. Given the advanced age of this case, and the fact that the parties have had the opportunity to fully brief the retaliation issue as argued, if not actually pled, by Plaintiff, this Court will not belabor the issue by requiring an Amendment of Count V. As further explained below, the issue of amending Count V to conform to the motion briefing is mooted because (i) Defendants have moved for

Complaint, Count V, ¶ 3.

In Count VI, Plaintiff brings an NJLAD claim under a discrimination theory for failure to accommodate. Specifically, Plaintiff alleges,

> Defendants did not properly engage with the Plaintiff in the 'interactive process' required by law; failed to 'reasonably accommodate' Plaintiff as is required by the New Jersey Law Against Discrimination; and otherwise discriminated against the Plaintiff on account of her disability and or handicap.
> Rather than provide the Plaintiff a reasonable accommodation, the Defendants terminated the Plaintiff under the guise of progressive discipline in accordance with their employee manual.

Complaint, Count VI, ¶¶ 3-4. Looking to the pleadings in this case, therefore, there are five theories of liability presented by the four surviving counts: CEPA (Count I); FMLA Interference and FMLA Retaliation (Count II); NJLAD Retaliation (Count V); and NJLAD Discrimination by Failure to Accommodate (Count VI). Defendants move for summary judgment on all four counts, and, additionally, move for judgment on Counts V and VI in the event they were intended to state an NJLAD disparate treatment disability discrimination claim. Because, although the Complaint is ambiguously worded, Plaintiff's Opposition and Cross Motion make clear that the nature of Plaintiff's NJLAD "discrimination" claim sounds in retaliation, not disparate treatment, and Plaintiff has declined to introduce any evidence of disparate treatment into the record on summary judgment, the Court grants Defendants' motion for summary judgment on Plaintiffs' Count V NJLAD disparate treatment discrimination claim as unopposed. Finally, Defendants move for judgment on all individual liability claims against Joan DuVall and Carolann Bass (the "Individual Defendants").

---

summary judgment on Count V in the event it intended to state a general, disparate treatment, disability discrimination claim, and Plaintiff failed to oppose under that reading, choosing instead to focus on the retaliation arguments only; and (ii) the Court finds summary judgment in favor of Defendants appropriate on all bases.

Plaintiff cross moves for summary judgment on three counts: (1) Count VI, NJLAD failure to accommodate claim (Plaintiff's Opposition Brief ("Opp."), Point I)[10]; (2) Count V, NJLAD retaliation claim (Opp. Points II,[11] III, VIII); and (3) Count II, FMLA retaliation claim (Opp. Point IV, VI,[12] VII) and Count II, FMLA interference claim (Opp. Point V). Plaintiff also opposes summary judgment on all claims against the Individual Defendants. Finally, in response to Defendants' motion, Plaintiff withdraws her Count I, CEPA claim, which the Court hereby dismisses with prejudice. In their Reply, Defendants contend that Plaintiff's sudden waiver of her CEPA claim after the close of discovery and the completion of the initial briefing on summary judgment warrants an award of attorneys' fees. The parties subsequently fully briefed the question of whether an award of attorneys' fees would be appropriate in a separate motion on which the Court will reserve decision.

---

[10] Plaintiff's Opposition and Cross Motion for Summary Judgment does not symmetrically oppose Defendants' arguments from their moving brief, and instead presents eleven "Points," which the Court has reorganized to correspond to the following coherent arguments.

[11] In Point II, Plaintiff purports to move for summary judgment on Count VI under an NJLAD disability discrimination theory, but in fact makes only arguments relevant to Plaintiff's Count V, NJLAD retaliation claim. Point II(A) is an affirmative argument for summary judgment for NJLAD retaliation and Point II(B) is an argument attempting to rebut Defendants' claim in their motion seeking judgment on Count V that Defendants terminated Plaintiff for a legitimate business reason — in other words attempting to establish that Defendants' stated reason was merely a pretext for impermissible retaliation. Despite purporting to concern "discrimination" under Count VI, Point II does not provide any non-retaliation based disability discrimination arguments.

[12] In Point VI, Plaintiff discusses the two analytical frameworks established by the courts for evaluating FMLA retaliation claims: mixed motive (Point VI(A)) and pretext (Point VI(B)). Plaintiff mistakes these for independent causes of action for "discrimination" under the FMLA in Count II. As explained, below, however, "mixed motive" and "pretext" refer to burden-shifting frameworks which courts apply to evaluate FMLA retaliation claims on summary judgment. They are not, as Plaintiff suggests, independent causes of action for which Plaintiff may establish a prima facie case. The Court, accordingly, will construe the coherent parts of Point VI as arguments in further support of Plaintiff's Count II FMLA retaliation claim.

In the present opinion, the Court will address A) the parties' cross motions for summary judgment on Count II, FMLA Interference and FMLA Retaliation; B) the parties' cross motions for summary judgment on Count V, NJLAD Retaliation; C) the parties' cross motions for summary judgment on Count VI, NJLAD Discrimination by Failure to Accommodate; and D) Defendants' motion for summary judgment on all liability claims against the Individual Defendants.

## A. Count II, FMLA

"Two types of claims can arise under the FMLA, retaliation (29 U.S.C. § 2615(a)(2)) and interference (29 U.S.C. § 2615(a)(1))." *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 245 (3d Cir. 2016). Plaintiff raises claims under both provisions of the statute.

### 1. FMLA Interference Claim

To make a claim of interference under the FMLA, a plaintiff must establish:

(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

*Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 155 (3d Cir. 2017) (quoting *Ross*, 755 F.3d at 191–92 (citation omitted)). In other words, "[t]o assert an interference claim, 'the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them." *Callison v. City of Phila.*, 430 F.3d 117, 119 (3d Cir. 2005) (citing 29 U.S.C. §§ 2612(a), 2614(a)). "Under this theory, the employee need not show that he was treated differently than others[, and] the employer cannot justify its actions by establishing a legitimate business purpose for its decision." *Id.* at 119-120. "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the

FMLA." *Id.* at 120. "Because the FMLA is not about discrimination, a *McDonnell-Douglas* burden-shifting analysis is not required." *Sommer v. The Vanguard Grp.,* 461 F.3d 397, 399 (3d Cir. 2006).

Defendants move for summary judgment on the ground that Plaintiff has failed to establish the fifth element of a prima facie case for FLMA interference, that Plaintiff was actually denied a benefit to which she was entitled under the statute. This Court agrees. The Third Circuit Court of Appeals has "made it plain that, for an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld." *Capps*, 847 F.3d at 156 (quoting *Ross*, 755 F.3d at 192). In her deposition, Plaintiff testified that she had never been denied a requested FMLA leave, and that Defendants had fully complied with all work restrictions imposed by Plaintiff's doctors upon her return from FMLA leave. Marrin Dep. Tr. 67:14-16 (Q: "Okay. All right. And were your requests to take intermittent FMLA leave granted?" A: "Yes."); Marrin Dep. Tr. 70:14-72:3 (Capital Health complied with the restrictions on lifting, sitting, and standing and limiting hours of work on all occasions when Plaintiff returned from FMLA leave with such restrictions). The other undisputed evidence in the record does not reflect that Plaintiff was ever denied any benefit guaranteed under the FMLA. Plaintiff cannot, as a matter of law, assert a claim for FMLA interference in the absence of such a denial.

In her Opposition, Plaintiff makes three arguments in response. First, Plaintiff argues that she should not have been disciplined for failure to comply with the call-out sick procedure due to her ignorance of the lab policy and her previous course of dealing with the lab's former supervisor. This argument is irrelevant to the existence of a denial of FMLA benefits and is not responsive to Defendants' motion.

Second, Plaintiff argues that by failing to provide Plaintiff with Carolann Bass' cell phone number or Joan DuVall's cell phone number as an alternative method of calling in sick to speaking with the tech-in-charge or lab supervisor, Defendants deprived Plaintiff of the right to use her FMLA because she would not be able to call in sick if there were not a tech-in-charge or supervisor available. Again, this argument is irrelevant to the existence of a denial of FMLA benefits and not responsive to Defendants' motion because Plaintiff admitted that she was never denied any FMLA benefits. Marrin Dep. Tr. 67:14-16. Specifically, concerning the call-out policy, Plaintiff also testified at her deposition that there was never a time in which she was unable to request FMLA leave due to an inability to speak to a tech-in-charge or supervisor. Marrin Dep. Tr. 147:23-148:9. Even taking Plaintiff's allegations of a potential inability to call-out as true, therefore, Plaintiff nevertheless fails to state a prima facie case for FMLA interference because no actual denial of benefits ever resulted. *Callison*, 430 F.3d at 119 ("the employee . . . needs to show that he was entitled to benefits under the FMLA *and that he was denied them*.") (quotation omitted) (emphasis added).

Third and finally, Plaintiff argues that one of the confidential emails Plaintiff obtained stated that if sick leave was used for a period of less than four days, it could not be documented as FMLA. Plaintiff argues that this email reflects one of Defendants' office policies that impermissibly could have restricted Plaintiff's ability to use her approved intermittent FMLA leave. As an initial matter, Plaintiff simply misquotes the confidential email in question. Plaintiff was out of the office for the first two full work weeks of February, from 2/4-2/8 and from 2/12-2/15. Plaintiff's Ex. 14. It is undisputed that employees approved for intermittent FMLA, including Plaintiff, had the authority to determine whether their out of office time would be categorized as FMLA or PTO. Plaintiff testified in her deposition that it was her customary

practice to inform her supervisor, Carolann Bass, how Plaintiff would like her out of office time to be categorized upon Plaintiff's return to the office after each leave. Marrin Dep. Tr. 289:13-290:1. On Monday, February 18, Plaintiff's first day back in the lab after her two week leave, Carolann Bass wrote an email to Analore and DuVall stating:

> Janice came to work today with a note that indicates she was out due to an exacerbation of her anxiety related to stress at work 2/12 to 2/15. Janice stated that she did not want the last 2 weeks going toward her FLMA. I'm not sure what we do about this.

A couple of hours later, Ms. DuVall responded, *inter alia*, that:

> We met with Rick Werner-he said anytime an employee is off for more than 3 days straight it most likely needs to be FMLA so we will leave the 2/4-2/8 as FMLA. With regards to her absence from last week-he is calling an attorney tomorrow and will get back to us. Most likely the attorney will say we have to use FMLA . . .

P. Ex. 14. Ms. DuVall's email clearly states that Mr. Werner advised that leaves of *more than three days straight* most likely *must* be categorized as FMLA, not, as Plaintiff contends, that leaves of *fewer than four days may not* be categorized as FMLA.[13] More importantly, as was the case with Plaintiff's two other arguments, Plaintiff's third argument is phrased purely in the hypothetical. *See, e.g.*, Opp., 34 ("If the Plaintiff had to call in sick for one, two, or three days as a result of her fibromyalgia she would . . .") . Plaintiff does not contend that she in fact was ever prevented from categorizing leaves of one, two, or three days as FMLA. Again, therefore, Plaintiff has failed to show that she suffered a denial of FMLA benefits, as required to make a prima facie interference claim.

---

[13] Mr. Werner confirmed during his deposition that it was his understanding that the FMLA required leaves of more than four days to be categorized as FMLA leave. Werner Dep. Tr. 8:15-19 ("For more than three days straight is because, as I understand FMLA, that if it's greater than three days and requires continued treatment, that it's covered by the FMLA so the employee – it wouldn't count against the employee."). This potential requirement, which Plaintiff does not dispute, does not purport to affect how leaves of fewer than four days are categorized.

## 2. FMLA Retaliation Claim

The Third Circuit has observed that "[t]o prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301–02 (3d Cir. 2012). Plaintiffs in retaliation cases under the FMLA may set forth a prima facie case using either direct or circumstantial evidence. The type of evidence upon which a plaintiff relies determines the legal standard which courts apply on a summary judgment motion. "Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law. Accordingly, claims based on circumstantial evidence have been assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), while claims based on direct evidence have been assessed under the mixed-motive framework set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 276–77 (1989) (O'Connor, J., concurring)." *Lichtenstein*, 691 F.3d at 301–02.

When an FMLA plaintiff attempts to prove discrimination or retaliation by circumstantial evidence the court employs the burden-shifting analysis established in *McDonnell Douglas*. The Third Circuit has explained this burden shifting framework as follows:

> A plaintiff must first produce evidence sufficient to convince a reasonable factfinder as to all of the elements of a prima facie case of discrimination. If a plaintiff establishes a prima facie case, "'[t]he burden of production (but not the burden of persuasion) shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that the defendant had a legitimate, nondiscriminatory reason for the [adverse employment decision].'" An employer need not prove, however, that the proffered reasons actually motivated the [employment] decision. If a defendant satisfies this burden, a plaintiff may then survive summary judgment by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Kautz v. Met-Pro Corp.*, 412 F.3d 463, 465 (3d Cir. 2005) (quoting *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000)).

When an FMLA plaintiff attempts to prove discrimination or retaliation by direct evidence[14] the Court applies the *Price Waterhouse* framework. There, the plaintiff must first present "'direct evidence' that his [FMLA leave] was a substantial factor in the decision to fire him." *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 147 (3d Cir. 2004) (quoting *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002)). "'[T]he burden of persuasion on the issue of causation [then] shifts, and the employer must prove that it would have fired the plaintiff even if it had not considered [the FMLA leave].'" *Conoshenti*, 364 F.3d at 147 (quoting *Fakete,* 308 F.3d at 338).[10] In *Price Waterhouse*, Justice O'Connor explained that this burden requires the employer:

> To convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor. The employer need not isolate the sole cause for the decision; rather it must demonstrate that with the illegitimate factor removed from the calculus, sufficient business reasons would have induced it to take the same employment action. This evidentiary scheme essentially requires the employer to place the employee in the same position he or she would have occupied absent discrimination.

*Price Waterhouse,* 490 U.S. at 276–77.

### a) Prima Facie Case

Here, Defendants contend that Plaintiff has failed to set forth a prima facie case for FMLA retaliation because Plaintiff has not shown the third element of causation. Plaintiff, in her Opposition and Cross Motion, attempts to show causation on the basis of circumstantial evidence in the form of the timing of her termination and an alleged pattern of antagonism against Plaintiff

---

[14] "'Direct evidence' means evidence sufficient to allow the jury to find that 'the decision makers placed substantial negative reliance on [the protected activity] in reaching their decision' to fire him." *Conoshenti,* 364 F.3d at 148 n. 10 (*quoting Fakete,* 308 F.3d at 338–39).

by her supervisors Bass and DuVall.[15] Reviewing the circumstantial evidence in the record on summary judgment, the Court finds that Plaintiff has established a prima facie case of retaliation under the FMLA on the basis of the timing of her termination.

As a threshold matter, the parties do not dispute that Plaintiff has satisfied the first two elements of a prima facie case of retaliation. Plaintiff engaged in a protected activity when she took leave under the FMLA from February 26 through March 25 or 26, 2013, and when she complained to Human Resources on March 18, 2013, about her supervisors' perceived interference with her enjoyment of rights under FMLA. And Plaintiff suffered an adverse employment action when she was terminated on April 4, 2013.

To demonstrate a prima facie case of causation, Plaintiff must "point to evidence sufficient to create an inference that a causative link exists" between her engagement in protected activity and her termination. *Lichtenstein*, 691 F.3d at 307 (citing *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279–81 (3d Cir. 2000)). Whether a causal link exists between the protected activities and Plaintiff's termination "must be considered with a careful eye to the specific facts and circumstances encountered." *Farrell,* 206 F.3d at 279 n. 5. "To demonstrate a causal connection, a plaintiff generally must show 'either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.'" *Budhun v. Reading Hosp. & Med.*

---

[15] Plaintiff also argues, on the basis of *Crewl v. Port Auth. of Allegheny Cty.*, 837 F. Supp. 2d 495 (W.D. Pa. 2011), an opinion of the Western District of Pennsylvania, which Plaintiff incorrectly cites as controlling Third Circuit authority, that a consideration of the circumstantial evidence in this case is not necessary because "Plaintiff's use of her FMLA leave was the predicate basis for her discharge." *Id.* at 506. That contention is simply not supported by any facts in the record. Plaintiff was granted every FMLA leave she requested, and, unlike the facts in *Crewl*, Defendants did not purport to terminate Plaintiff explicitly *because* of the use of her FMLA leave. *Crewl* and the other authorities Plaintiff cites on these points are simply inapposite.

*Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis,* 480 F.3d 259, 267 (3d Cir. 2007)).

Although the Third Circuit has been "reluctant to infer a causal connection based on temporal proximity alone," the standard for "unusually suggestive" temporal proximity *at the prima facie stage* is not a high one. *Budhun*, 765 F.3d at 258 (citing *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001)). The Third Circuit has identified the following examples as constituting sufficiently close temporal proximity to qualify as unusually suggestive timing: deciding to replace the plaintiff during the plaintiff's FMLA leave and informing the plaintiff that she had been replaced two days after her FMLA leave ended; terminating the plaintiff less than a week after the plaintiff invoked her right to FMLA leave; terminating the plaintiff several days after the plaintiff took FMLA leave; and terminating the plaintiff three months after requesting FMLA leave and the day she was scheduled to return to work. *Id.* at 258.

Here, Plaintiff met with Mr. Werner on March 18, 2013, at which time she provided him with the three confidential e-mails, followed by the internal investigation into Plaintiff's possession of those emails, which ultimately led to Plaintiff's firing. Defendants' Ex. 24. At the time of her meeting, Plaintiff was still out of work on approved FMLA leave, from which she did not formally return until approximately March 26, 2013, at the latest. Plaintiff was terminated on April 4, 2013, seventeen (17) calendar days after raising her complaint about her supervisors' interfering with the reporting of her FMLA leave during her meeting with Mr. Werner, and nine (9) calendar days after returning from FMLA leave. Courts in the Third Circuit routinely find periods of such duration to satisfy the standard of unusually suggestive temporal proximity at the

prima facie stage, and this Court does as well.[16] Accordingly, Plaintiff has met her initial burden

to show causation and has stated a prima facie case of FMLA retaliation. Because the Court finds

timing alone sufficient to set forth a prima facie case, the Court need not address Plaintiff's

arguments that her supervisors exhibited a pattern of antagonism toward her.

### b) Legitimate Business Reason

Moving to step two of the *McDonnell Douglas* framework, Defendants have shown a

legitimate, nondiscriminatory basis for Plaintiff's termination. The stated reason for Plaintiff's

termination in her official, April 4, 2013 termination notice is "failure to cooperate during an

ongoing investigation." Defendant's Ex. 5. The notice specifies that upon being informed on

March 28, 2013 of the investigation into how she obtained the confidential e-mails, Plaintiff

initially told Defendants that she had received them anonymously from a friend. *Ibid.* The notice

states that at a follow up meeting, Plaintiff "refused to answer" how these documents were

presented to her or what additional documents were provided. *Ibid.*[17]

It is undisputed that Mr. Werner was the final decision maker for Defendant Capital

Health with the authority to terminate Plaintiff, and that Mr. Werner is the one who ultimately

---

[16] *See Lichtenstein v. UPMC*, 691 F.3d 294, 307 (3d Cir. 2012) (7 days is unduly suggestive); *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003) (10 days is unduly suggestive); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989) (finding two days unduly suggestive); *Capps v. Mondelez Global LLC*, 147 F.Supp.3d 327, 337 (E.D. Pa. 2015) (a period of 6 days was characterized "at the long end of" being unusually suggestive); *Sowell v. Kelly Services, Inc.*, 139 F.Supp.3d 684, 695 (E.D. Pa. 2015) (7 days is "within the realm of what courts have found to be sufficient to establish a prima facie case"); *but see Williams v. Phila. Housing Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (2 months is not unusually suggestive).

[17] The notice erroneously states that Plaintiff provided Werner with the confidential e-mails on February 21, 2013. This is plainly impossible as the e-mails were not yet missing on February 22, 2013. Bass Decl. ¶ 20. This is clearly a typographical error, given Mr. Werner's own notes, in the record on summary judgment, stating that he received the e-mails from Plaintiff on March 18, 2013.

decided to fire Plaintiff on April 4, 2013. Werner Decl. ¶ 17; Defendant's Ex. 5. At his deposition, Mr. Werner explained that "failure to cooperate with the ongoing internal investigation" primarily referred to Plaintiff's refusal to answer questions in the meetings following her initial March 28 meeting with supervisors investigating the missing documents. *See, e.g.*, Werner Dep. Tr. 16:15-20 ("Janice refused to comply with – answer her questions about where she received the information that she received, those e-mails. And based on that information, went to outside counsel and reviewed it with that person and then terminated her employment for that reason."); *Id.* at 17:18-18:2 (Q: "But in those documents, wasn't it that Ms. Marrin stated that she didn't know who put the e-mails into her area?" . . . A: "No. She – in my meeting with her, she did not want to answer where she got them from. In Joanie's correspondence of the meeting she did not want to answer. She would not answer where they came from."); *Id.* at 18:20-19:19 (Q: "Is it your recollection that she didn't tell Ms. Bass that she didn't know who put the e-mails in there, in her area to find?" A: "No. It was my recollection that when she spoke to me in the meeting and with Joanie DuVall that she was not going to divulge that information. She knew, but she was not going to divulge it." Q: "Is that why she was terminated?" A: "She was terminated for no – for failure to comply with the investigation that we were doing." Q: "And when you say 'failure to comply with the investigation,' do you mean – A: "Cooperate." Q: "Was that failure to tell who put the e-mails in her belongings?" A: "I think that she did not cooperate with providing that information when Joanie asked her several questions about where she got the information.").

       In his sworn declaration, Mr. Werner further explained that he was particularly troubled by Plaintiff's failure to cooperate in light of the fact that the results of Defendants' internal investigation suggested that Plaintiff herself had broken into Ms. Bass' filing cabinet while she

was alone in Ms. Bass' office. Werner Decl. ¶ 17 ("In early April, after I had compiled all of the evidence from the internal reviews, reviewed the statements, and consulted with outside counsel, I made the determination that Ms. Marrin's employment should be terminated for failure to cooperate in the internal investigation. In fact, the investigation suggested that Ms. Marrin herself had broken into Ms. Bass' filing cabinet while alone in Ms. Bass' office and had taken the entire folder containing the emails and other confidential documents concerning other lab techs."). Reasonably, Defendants felt the need to question Plaintiff again about the manner in which she obtained the documents, after Defendants' internal investigation strongly suggested that Plaintiff had taken the documents herself.

In further support of their reasoning, Defendants have introduced much of the evidence from the internal investigation into the record on summary judgment. Plaintiff's direct supervisor, Bass, told Werner that on Friday, February 22, 2013, she had been speaking with Plaintiff in Bass' office, so that Plaintiff was looking at Bass as she placed personal files in the Carolann folder. Bass Decl. ¶ 20. Additionally, Plaintiff had been in Bass' office speaking with or yelling at Bass the day before on February 21, 2013. Plaintiff worked the weekend of February 23-24. When, as part of the internal investigation, Bass interviewed the other lab techs working that weekend, they stated that they had seen Plaintiff enter Bass' office alone during the weekend of February 23-24. Bass Decl. ¶ 22. During the March 28 meeting, Plaintiff admitted to Bass that she would go into Bass' office alone to drink coffee, but denied taking the documents. Bass Decl. ¶ 23. Plaintiff also admitted during the investigation that she had received the e-mails sometime around the weekend in February that she had worked, and that she could not remember having seen anyone else go into Bass' office that weekend. Defendants' Ex. 27. In short, Defendants' internal investigation had revealed evidence suggesting that Plaintiff had

foreknowledge of the location of the taken documents; the documents likely disappeared a day or two after Plaintiff acquired this knowledge; Plaintiff had the opportunity to take the documents during the period in which she was alone in Bass' office, which coincided with the period in which the documents are known to have disappeared; and no one else is known to have had the opportunity to take the documents during this period.

Finally, in addition to Plaintiff's conduct during interview sessions and the results of the internal investigation, Mr. Werner stated at his deposition that his decision was influenced in part by Plaintiff's past disciplinary history. Werner Dep. Tr. 14:7-13 (Q: "Okay. And why is it that you made the decision to terminate her?" A: "Because she went through the progressive disciplinary process. She was at the last step in the process and her last actions, after we reviewed it, I checked with counsel and made a decision to terminate her."). Considering the significant evidence shown, Defendants have clearly met their burden of setting forth a legitimate business reason for Plaintiff's termination.

### c) Pretext Analysis

To show pretext at the third step of the *McDonnell Douglas* framework, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton v. Teleflex Inc.,* 707 F.3d 417, 427 (3d Cir. 2013) (internal quotation marks omitted). When a plaintiff challenges the "credibility of the employer's proffered justification," he must produce evidence "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.*

(internal quotation marks omitted). The Third Circuit has applied these principles "to require plaintiffs to present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 468 (3d Cir. 2005). The plaintiff "must show[ ] not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1109 (3d Cir.1997) (en banc). "[P]retext is not shown by evidence that 'the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" *Kautz*, 412 F.3d 463, 467 (3d Cir. 2005) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994)).

Moreover, "to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons ... was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes*, 32 F.3d at 764 (emphasis in the original). Plaintiff may be excused from this requirement in certain cases because where "defendant proffers a bagful of legitimate reasons," casting "substantial doubt on a fair number of them ... may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons." *Id.* at 764 n. 7. "Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232–33 (3d Cir. 2007) *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ( "The mere

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

With these principles in mind, the Court evaluates the circumstantial evidence offered by Plaintiff in response to Defendant's stated legitimate, nondiscriminatory basis for her firing.

i) **Failure to Cooperate with the Investigation**

Defendants have, from the time of Plaintiff's firing in April of 2013 to the present, consistently maintained that the proximate cause of Plaintiff's firing was her failure to cooperate with the internal investigation into the confidential documents that were taken from the filing cabinet in Ms. Bass' office in February 2013. In particular, Defendants contend that they found Plaintiff had failed to cooperate during the follow up meeting with Ms. DuVall after her initial March 28 meeting, when Plaintiff refused to answer Defendants' questions about how she obtained the three confidential e-mails that she had provided to Mr. Werner and what, if any, other documents she had obtained as well. Defendant's Ex. 5.

For her part, Plaintiff, in her deposition, does not deny that after the initial March 28 meeting, she no longer answered Defendants' questions. Going into the follow-up meeting with DuVall on or about April 3, for example, it was Plaintiff's position that she had already answered Defendants' questions and that she could not, and would not, be subjected to answering them again. Marrin Dep. Tr. 297:10-16 (Q: "In a follow-up meeting – I'm on the second paragraph under details of incident – Janice was asked how these documents were presented to her and she refused to answer. Why didn't you answer?" A: "I already was quested about these and I told them I knew everything – I told them everything I knew about them."); Marrin Dep. Tr. 297:21-291:1 ("I went into –was called into the office again. I knew I was being fired. The noose was out around my neck and getting tighter by the minute. I said to them, I'm not – I cannot go

through this anymore. I told you everything I know."); Marrin Dep. Tr. 298:7-13 (Q: "it says, she refused to answer, you said – did you say you –" A: "I already answered . . . that. I already answered them the first time they called me in there about them."). In short, although Plaintiff provides an additional gloss on her motivation for declining to answer any additional questions from Defendants, she does not dispute that she refused to provide answers to Defendants' questions. In one telling exchange, Plaintiff explained her response to DuVall at the follow-up meeting:

> Q: "Okay. So your response was you don't know anything else, I've told you everything that – that I know?" . . .
> A: No, no, that's not my response. My response is I cannot go through this anymore. I don't – I'm not going to sit here and I have been back to work a week and you have called me in here and harassed me and I cannot take it anymore, and I have nothing more to say. . . . I said I want – I do not – I cannot go through this anymore."

Marrin Dep. Tr. 299:11-300:7. Nothing in Plaintiff's discussion of her perspective on her conduct at the follow up meetings undermines or reveals to be incoherent, inconsistent, or contradictory, the Defendants' explanation that they believed Plaintiff to be uncooperative.

In reaching my conclusion, I am bound by the Third Circuit's recent adoption in *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 155 (3d Cir. 2017), of the "honest belief rule" in FMLA retaliation cases. In short, the honest belief rule, long the standard in other circuits, holds that in FMLA cases "arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are '*right* but whether the employer's description of its reasons is *honest.*'" *Id.* at 153 (quoting in parenthetical *Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992)). Under the rule, the "'critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.'" *Id.* at 153 (quoting *Pulczinski v.*

*Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir. 2012)). The *Capps* court ultimately applied the honest belief rule to determine that, where the defendant's internal investigation concluded that plaintiff was dishonest, the plaintiff failed to show pretext where there was "a lack of evidence that [defendant] did not honestly hold that belief." *Id.* at 155. Applied to this case, the holding of *Capps* requires Plaintiff to show not that the conclusions of her supervisors in deciding to discipline her or even the conclusions of the internal investigation that she was not cooperating and that she likely took the confidential documents at issue were mistaken. Rather, Plaintiff must introduce evidence tending to show that Defendants did not honestly believe their stated reasons for disciplining her or the results of the internal investigation.

Plaintiff does not even attempt to meet the *Capps* standard. A major underpinning of Plaintiff's explanation for her own conduct is her apparent belief that she had told the truth that the documents had been provided to her anonymously, and therefore could not provide any additional information in response to Defendants' questions. Under the honest belief rule, however, the truth of Plaintiff's explanation does not impact the Court's pretext analysis. Defendants, for example, have introduced their own evidence suggesting that they had reason to believe as the result of their investigation that Plaintiff in fact took the documents. Applying *Capps*, Plaintiff cannot show that Defendants' reason for firing her was pretextual by showing that they were mistaken in disbelieving her and therefore asking more questions which she refused to answer. Plaintiff must show that Defendants did not honestly believe she was refusing to answer their questions and otherwise cooperate with the investigation, but were instead taking action against her for some other discriminatory reason. In short, the truth of whether or not Plaintiff took the confidential documents is not before this Court.

This Court's analysis could, therefore, stop after its first inquiry: Defendants stated as their legitimate business reason for terminating Plaintiff that she refused to cooperate with their internal investigation by not answering their questions, and Plaintiff readily admits that she did refuse to cooperate with the internal investigation after her first interview on the grounds that in her opinion there was nothing more to say. Plaintiff does, however, make two additional arguments attempting to rebut Defendants' reason for termination.

Firstly, Plaintiff imports her NJLAD direct evidence of retaliation argument, which will be discussed at length below, to the *McDonnell Douglas* third step analysis, contending that, because the anonymous person who took the documents to give to Plaintiff, or Plaintiff herself in taking the documents, was protected under NJLAD in his or her conduct, any attempt by Defendants to force Plaintiff to disclose the identity of the anonymous person or admit to taking the documents herself would be an illegitimate retaliatory act.

As a threshold matter, Plaintiff has provided no law that individuals engaging in conduct protected by NJLAD are entitled under that statute to anonymity in their conduct. Nothing in the *Quinlan v. Curtiss-Wright Corp.*, 204 N.J. 239 (2010) decision cited by Plaintiff states that the plaintiff in that case could refuse to acknowledge to her employer that she had in fact taken the documents, or could not be terminated for such a refusal. Even presuming, however, that some authority protected Plaintiff from disclosing the existence of her or an anonymous person's protected conduct to Defendants, this Court's finding, as discussed *infra*, that the taking of the confidential documents in this case was not protected under NJLAD, moots Plaintiff's argument. Clearly Plaintiff cannot contend that she had a protected right under any antidiscrimination statute to willfully fail to disclose the existence of *unprotected* conduct to her employers.

ii)     **The Progressive Disciplinary Process**

Secondly, Plaintiff seizes upon the testimony of Mr. Werner, who stated at his deposition that part of the reason for Plaintiff's firing for not cooperating with the internal investigation was that Plaintiff was already at the last step of the progressive discipline process due to her disciplinary record. Plaintiff contends that her disciplinary record itself was assembled on pretextual grounds due to the discriminatory motives of her immediate supervisor Bass and lab director DuVall, who allegedly conspired to fabricate disciplinary infractions for which to punish Plaintiff in retaliation for her use of FMLA leave.[18]

As a threshold matter, Defendants contend that summary judgment on all issues related to the progressive discipline process should be granted in their favor, because in opposition to Defendants' extensive documentary record, certifications, and deposition testimony, including from Plaintiff's coworkers not named in the suit, Plaintiff has offered only her own self-serving certifications and deposition testimony. Defendants argue that Plaintiff is not entitled to defeat summary judgment on her unsupported word alone. It is true that "[a]s a general proposition, conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012) (quotation omitted). The Third Circuit, however, has held that "a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment or judgment as a matter of law." *Cappuccio v. Prime Capital Funding LLC*, 649 F.3d 180, 189 (3d Cir. 2011), *as amended* (Sept. 29, 2011) (citing

---

[18] At the outset, the Court must highlight the unusual nature of Plaintiff's argument. Rather than contending that Werner's stated reason for terminating Plaintiff at the close of the internal investigation into the missing confidential documents – failure to cooperate with the investigation by refusing to answer questions – is pretextual, Plaintiff contends that Mr. Werner's potentially unbiased decision was based upon a sham progressive disciplinary record that was assembled by Bass and particularly DuVall on pretextual grounds.

*Kirleis v. Dickie, McCamey & Chilcote, P.C.,* 560 F.3d 156, 161–63 (3d Cir. 2009). "This remains true even if the affidavit is 'self-serving' in the sense of supporting the affiant's own legal claim or interests." *Id.* at 189-90. The core inquiry for the court then on whether a plaintiff's certification and testimony alone may defeat summary judgment is not whether they are self-serving, but whether they are conclusory or not based on personal knowledge. *Id.* at 190. Put differently, a self-serving affidavit may defeat summary judgment in the absence of other evidence rendering it incredible. *Gonzalez*, 678 F.3d at 264. Accordingly, contrary to Defendants' suggestion, Plaintiff is entitled to use her own certification in an attempt to defeat summary judgment, provided that her testimony is non-conclusory and based on her personal knowledge.

Plaintiff attempts to show that the progressive disciplinary program was a pretext for FMLA retaliation on nine[19] bases, which the Court addresses in turn.

1) DuVall asked Plaintiff to wear a lab coat instead of the plastic apron that Plaintiff preferred.

This incident did not result in discipline. Moreover, "petty intra-office squabbles, do[ ] not amount to the type of antagonism [the Third Circuit] ha[s] recognized" as actionable in the retaliation context. *Martinez v. Rapidigm, Inc.*, 290 F. App'x 521, 526 (3d Cir. 2008). The record also does not reflect that Plaintiff was singled-out in DuVall's enforcement of the lab coat policy. DuVall Dep. Tr. 36:1-3 ("I did discuss with Ms. Marrin the need to wear a lab coat, as I did with many employees within the laboratory."); DuVall Dep. Tr. 36:8-11 ("When I first joined Capital Health in the laboratory, I had conversations with all the supervisors regarding the lack of

---

[19] The Court has also imported Plaintiff's arguments attempting to establish a prima facie case through a pattern of antagonism to its *McDonnell Douglas* third step analysis in order to give Plaintiff the full benefit of the evidence in the record.

wearing lab coats in the lab."). This incident does not therefore present any evidence of discriminatory animus.

2) DuVall spoke to Plaintiff about complying with the laboratory's break policy and circulated a memorandum about it.

This incident also did not result in discipline. Additionally, there was no evidence in this case that Plaintiff was singled-out or treated differently with regard to the break policy, as Plaintiff acknowledged in her deposition that the memorandum was published to all employees. Marrin Dep. 201:22-202:12. Moreover, DuVall testified, and Plaintiff has not contradicted, that she spoke to many other people in the lab about complying with the break policy. DuVall Dep. Tr. 60:22-61:2 (Q: "Who else did you speak to about that (not complying with the break policy)?" A: "Numerous people." Q: "Who?" A: 'Probably everybody in the lab. I issued a memo to the entire laboratory about this and that we had to stop."); DuVall Dep. Tr. 61:15-20 ("Nancy Analore, Lana Pendrack (ph.), Carolann Bass, Pat Pilkington, John Boning, Dee Wolfe, Rita Kuziora, Susan Astrab, Irene Lakomcik, Kathy Martin. I'm sure there are many others, but I can specifically remember speaking to those folks about it."). This incident too does not evidence discriminatory animus.

3) Plaintiff requested a second shift in response to Bass' request for volunteers, but DuVall told Bass not to give Plaintiff the shift, and Plaintiff was not awarded the shift;

This incident also did not result in discipline, and the record does not reflect that Werner was aware of its occurrence in making the decision to terminate Plaintiff. Without additional context concerning the volunteers who were selected and the reasons for the selection process, this incident does not evidence discriminatory animus.

4) Bass scheduled Plaintiff to work on the blood culture bench on weekends, an undesirable posting to which she did not schedule other full-time lab techs;

Plaintiff's allegation that other full-time lab techs were not scheduled to the blood bench is conclusory, as Plaintiff has not provided any basis for her personal knowledge of such facts. Furthermore, Plaintiff's allegation in her certification that the blood culture bench was undesirable was contradicted by her deposition testimony that working conditions on the blood bench varied from overwhelming to very slow and that only some lab techs complained of working on the blood bench while others did not. Marrin Dep. Tr. 440:16-442:7.

5) Bass declined to give Plaintiff a loan of 16 working hours that Plaintiff requested pursuant to a provision of the employee handbook;

Plaintiff has not provided the Court with any evidence of an entitlement to a personal loan of work hours, and it is not otherwise attested to in the record on summary judgment. Plaintiff similarly has failed to provide any evidence of disparate treatment in the handling of her alleged loan request. This incident also did not result in discipline, and the record does not reflect that Werner was aware of its occurrence in making the decision to terminate Plaintiff.

6) The discipline for failure to comply with the written call out sick policy was unreasonable since Plaintiff employed the method she had used without discipline under DuVall's predecessor and DuVall failed to provide Plaintiff with an alternative mode of calling in sick;

The Court addresses this incident along with the other reported disciplinary action below.

7) The discipline for Plaintiff's dispute with a coworker was unreasonable because the investigation was inadequate and flawed; DuVall failed to interview Plaintiff about the incident, relying upon the word of the coworker alone; Plaintiff did not leave her post without permission as DuVall claimed; and Plaintiff's coworker failed to provide a written statement of her account of incident to Mr. Werner during his subsequent investigation of the incident;

The Court addresses this incident along with the other reported disciplinary action below. As a matter of law, however, Plaintiff's challenge to the adequacy of Defendants' investigation into the incident fails. "While evidence that an investigation was utterly foolish, biased, or unsubstantiated could be probative of a retaliatory motive, proof that it was imperfect, unwise, or

inaccurate would not. A challenge to the sufficiency or propriety of the investigation is inadequate to establish pretext." *Caplan v. L Brands/Victoria's Secret Stores, LLC*, 210 F. Supp. 3d 744, 768 (W.D. Pa. 2016) (citing *Fuentes*, 32 F.3d at 765 n.8). *See also Money v. Provident Mut. Life Ins. Co.*, 189 Fed. App'x. 114, 116–17 (3d Cir. 2006) (finding plaintiff's "naked credibility attack" on the adequacy of an investigation insufficient to establish pretext). Plaintiff's characterization of the investigation as incompetent does not establish retaliatory motive.

8) Plaintiff's January 2012 to December 2012 performance evaluation was suspect because DuVall provided comments, despite only joining Capital Health in November 2012;

The law is well-established in the Third Circuit that "[a]n employer may not use evaluating criteria which lacks any relationship at all to the performance of the employee being evaluated because to do so would be inconsistent with and contradictory to the employer's stated purpose. Absent this type of violation . . . [courts] will not second guess the method an employer uses to evaluate its employees." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 468 (3d Cir. 2005). Here, Plaintiff does not challenge that the criteria upon which she was evaluated were legitimate, but rather only objects to Ms. DuVall, who was hired in December 2012, commenting on an evaluation which titularly addressed the period between January 2012 and December 2012. Ms. DuVall, however, testified in her deposition that her comments on the evaluation were based on her interviews with Plaintiff's supervisor, as well as her own, post-December 2012 observations. DuVall Dep. Tr. 58:15-18 ("The comments I recall putting in Janice's 2012 evaluation were issues that had come up during 2012 and that had continued on through the early part of 2013 that we weren't seeing improvement."). Although Plaintiff's objection seems facially reasonable, that one should only be evaluated by supervisors who were present during the evaluation period, many of Ms. DuVall's comments in the performance evaluation openly acknowledge their basis

in 2013 conduct. *See, e.g.*, Defendant's Ex. 17 ("Since February 2013, Janice has received two disciplinary actions for her behavior, this indicates a lack of improvement."); *id* ("Janice was reminded several times to finish her 2012 packaging and shipping re-certification. As of March 2013 she has not completed this training and is not certified in packaging and shipping."). The evidence therefore does not support any invidious purpose or attempt to masquerade 2013 evaluations as 2012 evaluations.

9) The investigation into the missing documents was suspect because Plaintiff was questioned three times, while all other employees were questioned only once.

Plaintiff provides no explanation for how this evidences retaliatory animus. Plaintiff was the individual in whose possession three missing confidential documents were found. Common sense dictates that she would be spoken to more often about how she obtained the documents than other lab techs with no connection to the documents whatsoever, and that Plaintiff could respond to or give information following the statements given by the other lab techs.

Finally, in finding the sum of Plaintiff's grievances with the progressive disciplinary process at Capital Health insufficient to rebut Defendants' proffered legitimate business reason for her termination, the Court is particularly persuaded by the reasoning of the recent unreported decision of the Third Circuit in *Young v. City of Philadelphia Police Dep't*, 651 F. App'x 90 (3d Cir. 2016).[20] In *Young*, a female police recruit complained that a series of disciplinary actions by her prospective employer (a police department) constituted a pattern of antagonism sufficient to show the department's retaliation against her for filing a complaint of discrimination. The Third Circuit found a pattern of six disciplinary actions over three months, coupled with the plaintiff's "assertions that other recruits were not similarly punished for the same conduct" sufficient "to

---

[20] *Young* was decided under the framework of a Title VII retaliation action, which employs the same *McDonnell Douglas* analysis as the present FMLA action.

infer, at the prima face stage, a causal connection between the complaint and the adverse actions." *Id.* at 98. However, the police department employing the plaintiff in *Young* successfully carried its burden of articulating a legitimate, non-retaliatory reason for the plaintiff's rejection. The Third Circuit observed that next "[t]o show pretext, Young must show 'both that the [Department's] proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Id.* at 99 (quoting *Moore*, 461 F.3d at 342).

The Circuit Court found that the plaintiff had failed to show that the disciplinary process was pretextual for two reasons. Firstly, the plaintiff was unable to "contest that she engaged in most of the underlying conduct for which she was punished." *Id.* at 99. Secondly, the plaintiff did "not put forth evidence to show that she was subjected to more discipline than recruits who engaged in similar conduct, and thus did not show that the Department 'treated more favorably similarly situated persons'" who had not complained of discrimination. *Id.* at * 99 (quoting *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998)). The Court found that "general allegations about . . . comparators who received less discipline for similar infractions" were insufficient to survive summary judgment. *Id.*

The same factors are in play in this case. Firstly, despite Plaintiff's protestations to the contrary, in the evidence actually in the record before the Court, Plaintiff does not contest that she engaged in most of the conduct for which she was punished. Instead, Plaintiff largely only challenges the characterization or perception of her conduct by her coworkers and superiors. Turning first to #6, *supra*, her discipline for failure to comply with the call out policy on February 4 and 6, Plaintiff acknowledges that she did not comply with the written policy in effect at the time. Plaintiff contends instead that she was complying with an unwritten policy established by custom. Looking to #7, *supra*, the January 16 dispute with one of her coworkers

for which Plaintiff was disciplined for inappropriate behavior, Plaintiff does not dispute that she confronted her coworker about a perceived interpersonal problem between them, Marrin Dep. Tr. 101:10-20, and that her coworker was upset by this interaction. *Id.* at 102:5-7; 103:4-11. Rather, Plaintiff merely claims that her coworker "overreacted" to Plaintiff's conduct. *Ibid*. Furthermore, in her deposition, Plaintiff admits that she did leave her post, but nevertheless feels that it should not have been considered abandonment, because she was feeling ill and upset and needed to get some air. Marrin Dep. Tr. 291:4-8. The same holds true for the minor infractions for which Plaintiff was spoken to, but not disciplined. Plaintiff does not deny she was engaging in the conduct about which her superiors spoke to her, be it wearing a plastic apron, or combining break periods, only that this behavior should not have been considered objectionable or inappropriate.

Secondly, Plaintiff has introduced no evidence showing that "relevant comparators," that is, coworkers with "disciplinary records similar to hers" who engaged in "comparable" conduct, received less discipline. *Id.* at 99. Instead, the only evidence in the record indicates that Capital Health disciplined at least 12 lab techs for policy violations or inappropriate behavior during 2012 and 2013. DuVall Decl. ¶ 9. Of these, two, including Plaintiff, had approved FMLA leave; the others did not. Of those who were disciplined that did not have FMLA status, two were suspended, one for insubordination and one for attendance and punctuality, and a third was discharged. DuVall Decl. ¶ 10. The Court cannot on the record before it determine if these individuals were relative comparators, but the evidence at least suggests that Plaintiff was far from the only lab tech to face significant disciplinary measures.

In the absence of Plaintiff showing that the discipline she received was clearly unwarranted on the undisputed facts or was administered in a selective manner to her, this Court

simply cannot find Plaintiff has established that Defendants' legitimate business reason for terminating Plaintiff was pretextual. Plaintiff has provided no evidence that her supervisors did not honestly believe their reasons for administering discipline were appropriate. *See Capps,* 847 F.3d at 155.

### iii)    Temporal Proximity Alone

Plaintiff does not argue that the timing of Plaintiff's termination alone may rebut Defendants' stated legitimate business reason for Plaintiff's termination, but the Third Circuit recognizes such a manner of proof, so the Court will address it here. "Temporal proximity is a factor that can be used to establish the third element of a plaintiff's prima facie case of retaliation as well as to discredit an employer's justification at the third step of the *McDonnell Douglas* analysis." *Proudfoot v. Arnold Logistics, LLC*, 629 Fed. App'x. 303, 308 (3d Cir. 2015) (citing *Jalil v. Avdel Corp.,* 873 F.2d 701, 709 & n. 6 (3d Cir.1989)). "However, 'the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred.'" *Id.* (quoting *Jones v. Se. Pa. Transp. Auth.,* 796 F.3d 323, 332 (3d Cir. 2015) (internal quotation marks omitted)). "Thus, temporal proximity may be sufficient to show pretext '[i]n certain narrow circumstances' based on the particular facts and stage of a case." *Id.* (quoting *Marra v. Phila. Hous. Auth.,* 497 F.3d 286, 302 (3d Cir. 2007)).

The Third Circuit has not yet exhaustively opined on the complete list of circumstances in which temporal proximity alone may establish pretext, but has offered a few guideposts for the lower courts in conducting our analysis. In the seminal case of *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294 (3d Cir. 2012), the Third Circuit discussed the circumstances in which legitimate bases for termination had accrued before the plaintiff engaged in a protected activity, but could be overcome, at *McDonnell Douglas* step three, by the temporal proximity of a

subsequent adverse employment action to the protected activity alone. First, discussing the Seventh Circuit's opinion in *Kohls v. Beverly Enterprises Wisconsin, Inc.,* 259 F.3d 799 (7th Cir. 2001), the Third Circuit approved that court's reasoning that, where a supervisor is aware of existing problems with an employee before the plaintiff employee takes a protected leave, but then chooses to fire the plaintiff only after the leave, and cites the preexisting problems as the legitimate business reason for the termination, then the temporal proximity of the firing to the protected leave alone may be sufficient to defeat summary judgment. *Id.* at 311. The Third Circuit also endorsed the inverse principle, which was the actual holding in *Kohls*, that where the employer did not discover the legitimate deficiencies in the employee's work until after the employee took the protected leave, the temporal proximity of the plaintiff's firing to the protected leave would not defeat summary judgment for the employer. The *Lichtenstein* Court applied the principles of *Kohls* to find that the plaintiff in *Lichtenstein* had met her burden of demonstrating pretext on the basis of temporal proximity alone because (i) the undoubtedly sufficient non-discriminatory reasons for her termination had accrued prior to her taking leave, (ii) her employer was aware of these bases prior to plaintiff's taking leave, and (iii) her employer only chose to fire her, citing those bases, after the plaintiff took leave. *Id.* Those are not the facts here.

In this case, Defendant Capital Health terminated Plaintiff for failure to cooperate with an internal investigation. Plaintiff contends that this reason was in fact a pretext for Defendants' actual motive of retaliating against Plaintiff for her March 18, 2013 complaint to Human Resources about her supervisors' conspiracy to interfere with her FMLA leave, or, alternatively, retaliating against Plaintiff for taking her FMLA leave beginning February 26, 2013. A key contributing factor to Defendants' good faith belief that Plaintiff was not cooperating with the

investigation, however, was Defendant Werner's conclusion, after reviewing the materials collected during the investigation, that it was likely that Plaintiff herself took the confidential documents from Ms. Bass' office during the weekend of February 23-24. Werner's honest belief that Plaintiff likely took the documents made it clearer that Plaintiff was not cooperating with the investigation by initially claiming to have received the documents from an anonymous coworker and then refusing to answer questions about the source and nature of the documents she received. Applying the *Lichtenstein-Kohls* framework, part of the conduct of Plaintiff that Defendants perceived to be culpable occurred around February 23-24, *before* Plaintiff engaged in the activities protected under the FMLA that she claimed invited retaliation. As in *Kohls*, however, Werner, the decision maker for Capital Health in human resources matters, did not become aware of this activity until *after* Plaintiff had gone on leave and complained of discrimination.

Specifically, the sequence of events began with Plaintiff's meeting with Mr. Werner during the week of February 18, 2013. Defendants' Ex. 19. At that meeting, Plaintiff was not yet concerned about any alleged conspiracy to misreport her FMLA leave, and instead complained to Werner about a variety of subjects including deficiencies in the microbiology lab, the attitudes of her co-workers, and her last two disciplinary actions, which she claimed were unwarranted. Marrin Dep. 162:10-24, 175:21-177:3, 185:19- 187:18; Werner Decl. ¶ 3; Werner Notes, Defendants' Ex. 21. Werner conducted an internal investigation into Plaintiff's complaints against her coworkers and referred the issues regarding laboratory policy to Bass. Werner Decl. ¶ 4. Later that same week, on February 21, 2013 the incident for which Plaintiff was disciplined for speaking inappropriately to her supervisor, Ms. Bass occurred in Bass' office. Just a few days later, Plaintiff worked the weekend of February 22-23, the time when the confidential e-mails and other documents disappeared from the Carolann folder in Ms. Bass' office filing cabinet.

In the meantime, Plaintiff and Mr. Werner scheduled a follow-up meeting for March 18 to discuss the results of his internal investigation into her complaints from the week of February 18. Plaintiff, however, went out on FMLA leave beginning February 26, 2013. While still out on leave, Plaintiff attended the previously scheduled March 18 meeting with Werner, but instead of discussing her previous complaints, Plaintiff produced print outs of three confidential e-mails that later were revealed to have been among the documents taken from Ms. Bass' office on or around the weekend of February 22-23. Ms. Bass reported to Werner that the documents were missing from her filing cabinet at some point in "early 2013," but the record does not reflect whether this was before or after Plaintiff produced some of the taken documents. Bass Decl. ¶ 15. Regardless, the sequence of events that is known demonstrates that Plaintiffs' supervisor Bass and Human Resources Director Werner could not have become aware of the need for an investigation into the missing documents until at or shortly after Plaintiff's protected activities of going on leave on February 26 and complaining of discrimination at the March 18 meeting. The close temporal proximity between Plaintiff's complaint, return from FMLA leave, and firing is thus not sufficient on its own to establish pretext in this case.

Even to the extent that Plaintiff's failure to cooperate with Defendants' internal investigation was a basis for termination accruing after Plaintiff's engagement in protected activities, this case remains distinguishable from those in which temporal proximity alone has been found sufficient to establish pretext because there is no evidence that Defendants could have acted against Plaintiff on the same basis at some earlier time, but failed to do so until after Plaintiff engaged in protected activity. In the unreported case of *Sgro v. Bloomberg L.P.*, 331 F. App'x 932 (3d Cir. 2009), for example, the Third Circuit found that temporal proximity established pretext where the plaintiff had worked in the same group within his employer's

company for years on a schedule of fewer than five days per week and the employer only requested that the plaintiff work five days per week, and terminated the plaintiff for refusing, after the employee complained of discrimination. The Third Circuit held that although the "increased work requirement might have been entirely justifiable for business reasons, a reasonable jury could conclude that its suddenness points to retaliation." *Id.* at 940. In other words, the employer in *Sgro* could have caused the legitimate basis for terminating the plaintiff — his failure to agree to working more days per week — to accrue at any time during a long status quo — his years working in the same group. The Circuit Court thus held that a jury could find the sudden demand by the employer setting up the legitimate basis for termination — the requirement of a five day work week — pretextual due to its proximity to the plaintiff's complaint of discrimination.

Here, the comparable act of Defendants leading to Plaintiff's conduct creating a non-discriminatory basis for termination — failure to cooperate with an internal investigation — was the questioning of Plaintiff as part of the internal investigation. Simply put, Plaintiff could not have failed to answer the investigation's questions until she was questioned. Thus, unlike the defendants in *Sgro*, Defendants could not have chosen to question Plaintiff at any time during a long status quo, only suddenly to do so after Plaintiff engaged in protected conduct. The confidential documents involved in this case went missing on or around the weekend of February 23-24. They could not have been discovered missing, at the earliest until Monday, February 25, 2013, when Ms. Bass returned to work. Plaintiff, however, left for a month of FMLA leave on Tuesday, February 26, 2013. Unless this Court were prepared to hold that Defendants should have discovered the documents missing, launched an investigation, and questioned Plaintiff immediately on Monday, February 25, it would have been impossible for Defendants to question

Plaintiff before she engaged in an activity protected by the FMLA. Accordingly, unlike the facts of *Sgro*, it is improbable in this case that the act of Defendants which led to the legitimate business reason for Plaintiff's termination was strategically employed only after Plaintiff's protected conduct. Defendants simply had no choice but to investigate the missing documents after Plaintiff left on FMLA leave, if they wished to investigate them at all. Similarly, because Plaintiff complained of discrimination and disclosed for the first time her possession of the confidential documents on March 18, while Plaintiff was on FMLA leave, and Defendants could not interview Plaintiff during her leave, Defendants had no choice but to interview Plaintiff after her complaint if she were to be interviewed at all.

This Court's reading of *Sgro* is also consistent with the precedential decision in *Delli Santi v. CNA Ins. Companies,* 88 F.3d 192, 200 (3d Cir. 1996), upon which the *Sgro* court relied. In *Delli*, the Third Circuit held that "under the NJLAD's retaliation provision, the employer's sudden investigation of employee's low gas mileage reports after years of [the] employee submitting these suspicious reports without incident indicated a retaliatory motive." *Sgro*, 331 Fed App'x at 940-41. Again, the employer in that case took action — launching an investigation — which led to the legitimate basis for the plaintiff's termination — inaccurate mileage reports — suddenly after the plaintiff engaged in a protected activity and only after years in which the employer had had the opportunity to act. Here, by contrast, it was not the case that Plaintiff had a long history of being suspected of having taken confidential documents and Defendants only chose to launch an investigation into such suspicions upon Plaintiff's complaint of discrimination. Instead Defendants only became aware of the conduct requiring investigation during or after Plaintiff's engagement in FMLA protected activity.

The same principle distinguishes the present case from the Third Circuit's recent decision in *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231 (3d Cir. 2016). There, the Circuit Court held that the district court below should have found evidence of pretext sufficient to defeat summary judgment where "evidence disclosed that some of [plaintiffs'] objections were followed by adverse consequences in a matter of days. . . . Retaliatory motive is often revealed by such evidence. At the very least, it certainly raises a question of fact for a jury." *Id.* at 242-43. The Court found the temporal proximity of only a few days sufficient to defeat summary judgment, again in a circumstance in which the act of defendants, in that case placement of plaintiffs on a low performer list and transfer of plaintiffs to other duty assignments could have been performed at an earlier time, but were only undertaken after plaintiffs' protected complaints. Compared to the police department in *Fraternal Order of Police,* which had the capacity to transfer the plaintiffs or criticize their performance at any time, the Defendants in this case did not have a comparable ability to investigate conduct which had not yet been brought to their attention. *Fraternal Order of Police* and its ilk establish the principle that employers are not entitled to sit on their suspicions, waiting to act upon them only after allegations of discrimination or invocation of protected leave occurs. In the case at bar there was no comparable delay by Defendants in investigating the missing confidential documents. In context, therefore, their prompt action does not implicate the same concerns of potential discriminatory animus.

Accordingly, given the particular facts of this case, this matter does not fall within the narrow set of circumstances in which close temporal proximity alone is sufficient to establish pretext.

**B. Count V NJLAD Retaliation**

The elements of an NJLAD Retaliation claim closely track those under the FMLA. To set forth a prima facie case of retaliation under the NJLAD "the employee must demonstrate [1] that she engaged in a protected activity that was known to the employer, [2] that she was subjected to an adverse employment decision, and [3] that there is a causal link between the activity and the adverse action." *LaPaz v. Barnabas Health Sys.*, 634 F. App'x 367, 369 (3d Cir. 2015), *cert. denied*, 137 S. Ct. 188, 196 L. Ed. 2d 127 (2016) (citing *Battaglia v. United Parcel Serv., Inc.*, 214 N.J. 518, 545, 70 A.3d 602, 619 (2013)).

The New Jersey courts have also imported the *McDonnell Douglas* burden-shifting framework to adjudicate NJLAD claims based upon circumstantial evidence. *See Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 300 (3d Cir. 2004) ("The Supreme Court of New Jersey has explained the three-step burden shifting analysis as a starting point for analysis of claims under the NJLAD. Under this analysis a plaintiff first must establish a prima facie case . . . . If the plaintiff does so the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. Then, if the defendant meets this rather light burden, the plaintiff must discredit the defendant's proffered reason for its action or adduce evidence that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.") (quotations omitted).

The *Price Waterhouse* framework similarly applies to NJLAD claims based upon direct evidence. *Bertolotti v. AutoZone, Inc.*, 132 F. Supp. 3d 590, 598 (D.N.J. 2015) (quoting *Bergen Commercial Bank v. Sisler,* 157 N.J. 188, 208, 723 A.2d 944 (N.J.1999)). Under NJLAD, "'[w]hen an employee attempts to prove discrimination by *direct* evidence, the quality of evidence required to survive a motion for summary judgment is that which if believed, proves

[the] existence of [a] fact in issue *without inference or presumption.*'" *Ibid.* (emphasis in original). "In the context of a claim for wrongful discharge, an employee must show direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion . . . in deciding to terminate his or her employment." *Id.* (quotations omitted). Such direct evidence "requires 'conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude.' " *Starceski v. Westinghouse Electric Corp.,* 54 F.3d 1089, 1096 (3d Cir.1995) (quoting *Griffiths v. CIGNA Corp.,* 988 F.2d 457, 470 (3d Cir. 1993)). "If the employee meets this burden, the burden then shifts to the employer to show it would have made the same decision even in the absence of the impermissible consideration." *Bertolotti*, 132 F. Supp. 3d at 598 (quotation omitted).

### 1. Circumstantial Evidence

This Court's analysis of Count V, Plaintiff's NJLAD retaliation claim on the basis of circumstantial evidence, is therefore the same as its consideration of Plaintiff's FMLA retaliation claim, *supra*. The Court finds that, although Plaintiff has set forth a prima facie case of retaliation, Defendant has shown a legitimate business reason for Plaintiff's termination, and Plaintiff has failed to show pretext. Defendants are therefore entitled to judgment on Count V on the basis of the circumstantial evidence.

### 2. Direct Evidence

Unlike Plaintiff's FMLA claim, for which there manifestly was no direct evidence of discriminatory intent, Plaintiff alleges in the context of her NJLAD claim that Defendants have admitted to substantially, negatively relying on an illegitimate criterion. Specifically, Plaintiff argues that Defendants' termination of Plaintiff was "based on the Defendants' belief that she took the emails and or would not tell Defendant DuVall who gave her the emails;" Opp. 16.

Plaintiff contends that either her conduct in taking the e-mails or the anonymous person's conduct in taking the e-mails was protected from reprisal under NJLAD pursuant to the New Jersey Supreme Court's decision in *Quinlan v. Curtiss-Wright Corp.*, 204 N.J. 239 (2010). From this Plaintiff argues that Defendants were not permitted to negatively rely on the taking of the documents, and that Defendants' termination of Plaintiff in reliance on the protected taking was a violation of the NJLAD.

As a threshold matter, assuming as the Plaintiff does, that *Quinlan* would govern the conduct of either Plaintiff or a third party in taking Defendants' documents, the Court disagrees that the taking of documents in this case would be protected under NJLAD, pursuant to the holding of the New Jersey Supreme Court in *Quinlan*.[21] The New Jersey Supreme Court succinctly set forth the facts of the case in *Quinlan*.

> Plaintiff Joyce Quinlan, then the Executive Director of Human Resources for defendant Curtiss–Wright Corporation, believed that the company had discriminated against her when it promoted a man she thought was less qualified than she and made him her supervisor. In an effort to prove that her suspicions were true and that defendant was engaged in widespread sex discrimination, plaintiff gathered documents that were available to her in the ordinary course of her employment and turned copies of them over to an attorney. During discovery in her discrimination lawsuit, defendant learned that plaintiff had taken, and was continuing to take, copies of hundreds of documents it considered to be confidential. Following disclosure of one document that was particularly helpful to plaintiff's claim that she had been discriminated against when she was not

---

[21] The Court notes a certain inherent tension in Plaintiff's failure to definitively allege at the stage of a motion for summary judgment after almost three years of discovery whether Plaintiff in fact took the documents at issue in this case from her supervisor's office or was provided with them by a third party. In the remainder of her motion papers, Plaintiff contends that she did not take the confidential emails at issue. In her direct-evidence of retaliation argument, however, she contends that she should prevail under *Quinlan* whether she took the documents or not. The Court observes that Plaintiff's argument in the alternative raises a potential standing issue of whether, even if a third party's action in taking Defendants' documents were protected under NJLAD, Plaintiff would be able to assert the third party's rights by refusing to comply with the Defendants' investigation. As this issue is not dispositive, however, the Court will presume that *Craig v. Suburban Cablevision, Inc.*, 274 N.J. Super. 303, 312–13, 644 A.2d 112, 117 (App. Div. 1994), *aff'd,* 140 N.J. 623, 660 A.2d 505 (1995) resolves the standing question in Plaintiff's favor, as Plaintiff argues.

selected for the promotion, defendant fired her. The letter terminating plaintiff from her employment accused her of breach of company policies and theft. Believing that defendant had fired her because of the prosecution of her discrimination claim, plaintiff added a retaliation claim to her pending lawsuit.

*Quinlan v. Curtiss-Wright Corp.*, 204 N.J. 239, 244, 8 A.3d 209, 211–12 (2010). To evaluate whether the plaintiff's taking of the confidential documents was a protected activity under NJLAD, and therefore an impermissible basis for the plaintiff's firing, the New Jersey Supreme Court developed a multi-factor balancing test, including: 1) how the employee came to have possession of, or access to, the document; 2) what the employee did with the document; 3) the strength of the employer's interest in keeping the document confidential; 4) whether there is a clearly identified company policy on privacy or confidentiality that the employee's disclosure violated; 5) the relevance of the document vs. the disruptiveness of its disclosure to the employer's ordinary business; 6) the strength of the employee's reason for taking the document rather than merely identifying its existence to be requested in discovery; and 7) the broad remedial purpose of the legislature in passing LAD and the balance of rights of the employee and employer in prohibiting or permitting the document's use in the case.

Applying the newly minted balancing test to the facts of the case before it, the New Jersey Supreme Court found that "the wholesale copying and removal of documents was not protected activity and that if defendant terminated plaintiff for that reason, she could not prevail." *Id.* at 272. "Plaintiff had access to all of the documents as part of her duties, but amassed most of them through systematic review of files in her department; some of the initial 1800 pages included *plainly confidential information about other employees*; and defendant *had a reasonably clear company policy against taking the documents* to which plaintiff had agreed." *Id.* at 272 (emphasis added). The New Jersey Supreme Court found that the same could not be said of the document relevant to the plaintiff's case, which she provided only to her attorneys.

*Quinlan*, 204 N.J. at 272–73 ("On the other hand, as it relates to the Lewis appraisal, plaintiff gave it only to her attorneys, it was directly relevant to her claim, she had a colorable basis to believe that the Lewis appraisal would not have been disclosed during discovery, and although the use of that document was clearly upsetting to Lewis personally, it was not disruptive because its disclosure did not threaten the operation of the company in any way.").

Here, it is undisputed that the three confidential emails that Plaintiff ultimately produced to Mr. Werner were originally contained within a folder marked "Carolann," stored in the filing cabinet of Ms. Bass. It is also undisputed that the folder contained, in addition to the three emails and other personnel files relevant to Plaintiff, the personnel files of other lab techs and some documents personal to Ms. Bass. Bass Decl. 18. Capital Health had a clearly defined confidentiality policy available on line and contained in its Employee Handbook, which Plaintiff admitted receiving. Marrin Dep. Tr. 45:7-16. Accordingly, as was the case for the documents taken wholesale in *Quinlan*, if Plaintiff, or another employee, in fact took the documents from the folder in this case, containing both the three emails and a host of other confidential documents relevant to other employees, such a taking would not be protected under NJLAD.

In point of fact, the taking in this case would actually be more egregious than that in *Quinlan*, because, looking to the test's very first factor, Plaintiff or the other employee would have acquired the documents by breaking into a supervisor's private office and closed filing cabinet drawer. *See Quinlan*, 204 N.J. at 269 ("If the employee came upon it innocently, for example, in the ordinary course of his or her duties for the employer, this factor will generally favor the employee. In that evaluation, it will not be necessary that the employee came upon the document either inadvertently or accidentally, but it will suffice if the employee came into possession of the document in the ordinary course of his or her duties. If, however, the discovery

of the document was due to the employee's intentional acts outside of his or her ordinary duties, the balance will tip in the other direction. Therefore, the employee who finds a document by rummaging through files or by snooping around in offices of supervisors or other employees will not be entitled to claim the benefit of this factor."). These documents were clearly not ones to which the Plaintiff would have access in the ordinary course of her duties, and were obtained by her, or someone else through an intentional, unauthorized means.

Surveying the remaining factors that the Court in *Quinlan* set forth, but did not apply to its facts, I find that these factors are more mixed in their application in this case, but that, in the aggregate, they also weigh against finding the taking of the documents in the Carolann folder to be an activity protected under NJLAD. Under the second factor, Plaintiff brought the three confidential e-mails to the attention of her employer's human resources department, an innocent use of the documents. Ms. Bass's personal jury form, also among the documents taken, however, was left abandoned in a public space. Bass Decl. 17. The confidential personnel files of the other lab techs that were taken were simply never returned, remaining in the possession of either Plaintiff or a third party who had no right to review them. The second factor is thus mixed in its import. The sixth factor does not apply in this case because the documents in question were taken, perhaps in advance of a complaint to human resources, but not in anticipation of litigation.

Finally, the third, fifth, and seventh factors, all of which in one form or another call upon the Court to weigh the Defendants' interest in confidentiality against the interest of the Plaintiff in being able to develop and pursue her rights protected by NJLAD, are also split. For the three confidential e-mails which at least discuss FMLA leave, there is at least some merit to Plaintiff's claim of an interest in possession versus the Defendants' interest in confidentiality. Without evaluating the relative weight of the taken documents' *content*, it is sufficient for this Court to

observe that, unlike *Quinlan*, in which the New Jersey Supreme Court found one of the taken documents to significantly support the plaintiff's claims of sex discrimination, weighing in favor of protecting her taking of the document, here Plaintiff does not argue that any of the three confidential e-mails is a "smoking gun" providing direct evidence of discrimination. Instead, Plaintiff offers that at the time she brought them to Human Resources, she perceived them as such, and now argues that they support an inference that the progressive discipline program conducted against her was pretextual. For all of the other documents that went missing however, these factors weigh very strongly in favor of Defendants' confidentiality interest. A firm's protection of confidential employee personnel files from unauthorized disclosure is a paramount obligation of all employers.

Taken together, the factors, particularly the culpable manner in which the documents were obtained and the strong employer interest in protecting the personnel documents of other employees, weigh against a finding of protected conduct in this case. Assuming, as Plaintiff does, that the same analysis would apply to the conduct of a third party in taking the folder from Ms. Bass's office, the Court sees no difference in the lack of protection under NJLAD. Accordingly, because "[d]irect evidence" means evidence sufficient to allow the jury to find that "the 'decision makers placed substantial negative reliance on [the protected activity] in reaching their decision'" to fire Plaintiff, and the taking of the documents from a closed filing cabinet in Ms. Bass's private office was not a protected activity, Plaintiff has failed to show that Defendants' decision-making process in relying on the taking of the documents and Defendants' reaction to Plaintiff's response to the investigatory inquiry were improper or discriminatory. *Connors v. Chrysler Fin. Corp.,* 160 F.3d 971, 976 (3d Cir.1998) (quoting *Price Waterhouse,*

490 U.S. at 277, 109 S.Ct. 1775, 104 L.Ed.2d 268); *see also Anderson v. Consol. Rail Corp.,* 297 F.3d 242, 248 (3d Cir. 2002) (same).

Because Plaintiff has failed to make a prima facie case of retaliation on the basis of direct evidence, no consideration of the mixed-motive burden-shifting framework is required. Even were Plaintiff to have shown that the taking of the confidential documents in this case was a protected activity, Plaintiff's direct evidence of retaliation claim would nevertheless fail because Defendants have met their burden under the *Price Waterhouse* framework of demonstrating that they would have made the same decision absent the consideration of the taking of the documents. As explained in the context of the FMLA, *supra*, Defendants have produced substantial evidence supporting their assertion that the legitimate business reason for Plaintiff's termination was Plaintiff's failure to cooperate with an internal investigation. This failure to cooperate comprised Plaintiff's failure or refusal to respond to Defendants' questions during interviews, particularly from whom or how Plaintiff obtained the confidential documents and what other documents were obtained along with the confidential e-mails Plaintiff produced to human resources. Defendant's Ex. 5. Assuming that *Quinlan* rendered the taking of the documents a protected act under NJLAD, the decision nevertheless provides no protection from the disclosure of the existence of the protected act. In other words, Plaintiff has provided no legal authority that NJLAD entitles a plaintiff not only to take documents or receive documents, but to conceal the manner of their acquisition from her employer. The decision of Defendants to terminate Plaintiff for a perceived failure to disclose unprotected information and general refusal to cooperate is thus well documented in the record, separate and apart from Defendants' honest belief that Plaintiff herself took the confidential documents at issue.

## C. NJLAD Failure to Accommodate

In order to prevail on a failure to accommodate claim under the NJLAD, a plaintiff must establish four elements:

(1) she was disabled and her employer knew it;
(2) she requested an accommodation or assistance;
(3) her employer did not make a good faith effort to assist; and
(4) she could have been reasonably accommodated.

*Armstrong v. Burdette Tomlin Mem. Hosp.,* 438 F.3d 240, 246 (3d Cir. 2006) (citing *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 317–320 (3d Cir.1999). *See also Bertolotti v. AutoZone, Inc.*, 132 F. Supp. 3d 590, 602 (D.N.J. 2015) (same). When an employee requests an accommodation for a disability, the employer has a responsibility "to 'engage the employee in the interactive process of finding accommodations.' " *Armstrong,* 438 F.3d at 246 (quoting *Taylor,* 184 F.3d at 319). This burden does not require that "any particular concession must be made by the employer ... [but instead what it] requires is that employers make a good-faith effort to seek accommodations." *Victor,* 4 A.3d at 150 (alterations in original) (quoting *Taylor,* 184 F.3d at 317). An employer making a good faith effort in the interactive process bears the responsibility of "mak[ing] [a] reasonable effort to determine the appropriate accommodation." *Armstrong,* 438 F.3d at 247 (quoting *Tynan v. Vicinage 13 of Super. Ct.,* 351 N.J.Super. 385, 798 A.2d 648, 657 (Ct.App.Div.2002)). "If an 'employee could have been reasonably accommodated but for the employer's lack of good faith,' the employee will win on his failure to accommodate claim." *Id.* (quoting *Taylor*, 184 F.3d at 319-20.

Although Defendants use a standard in which the elements are phrased slightly differently, they fundamentally challenge the third and fourth elements of Plaintiff's prima facie case under the *Armstrong* standard: that Defendants did not make a reasonable, good faith effort to assist, and that Plaintiff could be accommodated. Specifically, Plaintiff contends that the lab's

call out policy, prohibiting the leaving of voice messages, impeded her ability to access her authorized disability leave. Plaintiff contends that since the policy required her to speak to a supervisor or tech-in-charge rather than leaving a message when calling out sick, and there were occasions when no supervisor or tech-in-charge was available, Plaintiff would be "forced to appear for work, sick . . . ." Doc. 24 at 12, ¶¶15-16. Accordingly, Plaintiff requested some accommodation allowing her to call in sick when no supervisor or tech-in-charge was available.[22]

Looking to the challenged elements, it is clear that Defendants made a good faith effort to accommodate and that Plaintiff could not be further accommodated because the undisputed evidence in the record shows that Defendants' existing accommodations and procedures already provided the relief Plaintiff sought. Firstly, in her deposition testimony, Plaintiff made clear that the situation she felt compelled accommodation – not being able to reach a supervisor or tech-in-charge in order to call out – had never actually happened to her. Plaintiff detailed a single incident taking place when Plaintiff called out for March 3-6, after she was disciplined for leaving a voicemail on Ms. Bass' machine, in which upon calling the laboratory clerk, she was briefly unable to speak to a supervisor or tech-in-charge, until the clerk was able to locate the acting supervisor of the blood bank, who accepted her call out. Marrin Dep. 138:18–139:18, 142:19–144:8, 147:23-148:9; 249:22-250:7.

Plaintiff also produced evidence which undermined her claim that she often would not know whom to call or for whom to ask in order to call out. The work schedules Plaintiff produced clearly show asterisks next to certain lab tech names and the notation, "Tech in

---

[22] There is some dispute as to whether Plaintiff ever formally requested an accommodation concerning the call out policy, but for the purposes of this motion, the Court will assume that she did so, on the basis of Plaintiff's deposition testimony.

Charge." Defendants' Exhibit 32. After claiming she did not know how the lab designated a tech in charge, Plaintiff then conceded the asterisk could denote the tech in charge for that shift. Marrin Dep. 140:16–142:8; *see also* Burns Dep. 11:20-12:7.

Finally, the specific accommodation that Plaintiff asserts should have been offered — "providing her with alternative telephone numbers or allowing her to leave a message," Second Amended Complaint at 12, ¶17 — was already provided by the laboratory. Plaintiff had access to Lab Director DuVall's cell phone. Marrin Dep. 200:4-6 (Q. "Was Joanie Duvall's cell phone number posted in the lab? A. I believe it was."). *See also* Burns Dep. 15:811. Ms. DuVall testified that her number was available for call outs, and that calling her directly to request sick leave would have been compliant with the call out policy. DuVall Dep. Tr. 71:1-3 (Q: "Could Janice Marrin have used your cell phone number to call out sick?" A: "Absolutely."); *Id.* at 71:11-15 (Q: "If Ms. Marrin called you up and said, I'm sick, she wouldn't have been compliant with the policy." A: "She would have been compliant with the policy."). Plaintiff provides no evidence to contradict this account.

Accordingly, the undisputed evidence in the record demonstrates that Plaintiff did not experience a work difficultly requiring accommodation due to the call out policy, and even if she had experienced such difficulty, the existing policies, procedures, and resources of her employer already provided the only accommodation she requested. Plaintiff therefore has failed to state a prima facie claim for failure to accommodate.

## D. Individual Claims

Because the Court grants Defendants' motion for summary judgment on all of Plaintiff's claims on the grounds that Plaintiff has not met her burden to produce some evidence of

discriminatory intent or pretext on the part of Capital Health or its agents, judgment in favor of the individual defendants will be granted on the same bases discussed above.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is granted and Plaintiff's cross motion is denied.

Dated:     5/31/2017                          /s/ Freda L. Wolfson
                                                   The Honorable Freda L. Wolfson
                                                     United States District Judge